**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
BETSY C. MANIFOLD (182450)
ALEX J. TRAMONTANO (276666)
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
tramontano@whafh.com

*Attorneys for Plaintiff*

**[*Additional Counsel Listed Below*]**

# UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| PATRICK KALLAUS, Derivatively on Behalf of HAWAIIAN ELECTRIC INDUSTRIES, INC. AND HAWAIIAN ELECTRIC COMPANY, INC, | Case No.: (Other Civil Action) |
| Plaintiff, | **VERIFIED SHARHOLDER DERIVATIVE COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| TIMOTHY E. JOHNS, JAMES A. AJELLO, SCOTT W. H. SEU, THOMAS B. FARGO, CELESTE A. CONNORS, ELISIA K. FLORES, PEGGY Y. FOWLER, MICAH A. KANE, YOKO OTANI, RICHARD J. DAHL, KEITH P. RUSSELL, MICHAEL J. KENNEDY, WILLIAM JAMES SCILACCI, JR., MARY E. KIPP, ALANA K. PAKKALA, TOBY B. TANIGUCHI, KEVIN M. BURKE, EVA T. ZLOTNICKA, MARY G. POWELL, CONSTANCE H. LAU, PAUL K. ITO, GREGORY C. HAZELTON, SHELEE M. T. KIMURA, and TANYE S. Y. SEKIMURA, | |

1

Defendants,

and,

HAWAIIAN ELECTRIC
INDUSTRIES, INC.
AND HAWAIIAN ELECTRIC
COMPANY, INC.

Nominal Defendant.

Plaintiff Patrick Kallaus ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Hawaiian Electric Industries, Inc. ("Hawaiian Electric" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy Defendants' violations of state and federal law that have occurred from February 28, 2019 through August 16, 2023 (the "Relevant Period") and have caused substantial harm to the Company.

## JURISDICTION

2.     This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 as the claims asserted herein arise under Sections 10(b),

21D, and 14(a) of the Securities Exchange Act of 1934. This Court also has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

3.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

4.     Venue is proper in this Court because: (a) the Company maintains its principal place of business in this District; (b) one or more of the defendants either resides in or maintains executive offices in this District; (c) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (d) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

5.     ***Plaintiff Patrick Kallaus*** is, and was at relevant times, a shareholder of the Company.   Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

6.     ***Nominal Defendants Hawaiian Electric Industries, Inc. and Hawaiian Electric Company, Inc.*** are Hawaii corporations sharing some of the same directors and officers and a corporate headquarters at 1001 Bishop Street, Suite 2900, Honolulu, Hawaii 96813. Hawaiian Electric Industries ("HEI") is a holding company that conducts its business through its wholly owned subsidiary, Hawaiian Electric

Company ("HECO"), a public utility.  Both Hawaiian Electric Industries and Hawaiian Electric Company will be referred to as "Hawaiian Electric" or the "Company," except where distinction is necessary.

**Director Defendants**

7.     *Defendant Timothy E. Johns* ("Johns") is and has been at all relevant times a Director of the Company and Chairman of its Board of Directors (the "Board").  The Company's website states that Defendant Johns has: "[c]orporate governance knowledge and familiarity with financial oversight and fiduciary responsibilities from overseeing the HMSA Internal Audit department, from his prior service as a director for The Gas Company LLC (now Hawaii Gas) and his current service as a trustee of the Parker Ranch Foundation Trust (charitable trust with assets valued at over $350 million), as a director and Audit Committee Chair for Parker Ranch, Inc. (largest ranch in Hawaii, with significant real estate assets), as a director and Audit Committee member for Grove Farm Company, Inc. (privately-held community and real estate development firm operating on the island of Kauai) and on the board of Kualoa Ranch, Inc."

8.     *Defendant James A. Ajello* ("Ajello") is and has been at all relevant times a Director of the Company and member of its Board's Audit and Risk Committee, having joined the Company in 2020.

9.     *Defendant Scott W. H. Seu* ("Seu") has served as the Company's President, Chief Executive Officer ("CEO"), and Director since January 2022. Defendant Seu also served in several leadership positions at the Company for almost three decades, including serving as (i) President and CEO of the Company from February 2020 to December 2021; (ii) Senior Vice President, Public Affairs, of the Company from January 2017 – February 2020; (iii) Vice President, System Operation, of the Company from May 2014 – December 2016; (iv) Vice President, Energy Resources and Operations, of the Company from January 2013 – April 2014;

4

and (v) Vice President, Energy Resources, of the Company from August 2010 – December 2012. As an expert in risk management and executive with decades of experience running the Company, Defendant Seu was aware of the risks posed to the Company due to potential wildfires and had a duty to address and mitigate such risks.

10. **Defendant Thomas B. Fargo** ("Fargo") has served as a Director of the Company since 2005. Defendant Fargo serves and has served at all relevant times as Chairman of the Board and Chairman of the Executive Committee of the Company, as well as a member of the Board's Compensation & Human Capital Management Committee and the Board's Nominating and Corporate Governance Committee. Defendant Fargo also served as a Director of the Company from 2005 to 2016.

11. **Defendant Celeste A. Connors** ("Connors") has served as a director of the Company since 2019. Defendant Connors also serves as a member of the Audit & Risk Committee.

12. **Defendant Elisia K. Flores** ("Flores") has served as a director of the Company since 2021. Defendant Flores also serves as a member of the Audit & Risk Committee.

13. **Defendant Peggy Y. Fowler** ("Fowler") has served as a director of the Company since 2019. Defendant Fowler served at all relevant times as a member of the Executive Committee, as well as a member of the Board's Compensation & Human Capital Management Committee and the Board's Nominating and Corporate Governance Committee. Defendant Fowler also served as a Director from 2009 to 2016. Defendant Fowler also previously served in executive roles for nearly four decades at Portland General Electric, including as President and CEO of the utility. As a result of all this experience, Defendant Fowler was well aware of the risks of wildfires and the need to adopt and implement a power shutoff system to avoid such wildfires.

14.   **Defendant Micah A. Kane** ("Kane") has served as a Director of the Company since 2019.  Defendant Kane also serves as a member of the Compensation & Human Capital Management and Nominating & Corporate Governance Committees.

15.   **Defendant Yoko Otani** ("Otani") is and has been a Director of the Company and member of the Board's Audit and Risk Committee since January 1, 2023.  The Company represents in its Proxy Statement that: "At the height of the financial crisis in 2008-2009 and thereafter with regulatory reforms in the financial services sector, Ms. Otani advised some of the most prestigious national and international financial services companies on multiple aspects of risk, compliance, business strategy and corporate governance in her role as managing director at a global financial consulting firm." As an expert in risk management and member of the Company's Audit and Risk Committee, Defendant Otani was aware of the material risks posed to the Company due to potential wildfires and had a duty to address and mitigate such risks.

16.   **Defendant Richard J. Dahl** ("Dahl") is and has been a Director since 2017.  Defendant Dahl served at all relevant times as a member of the Executive Committee, as well as a member of the Board's Compensation & Human Capital Management Committee and the Board's Audit and Risk Committee.   The Company's Proxy Statement dated March 24, 2023 stated that Defendant Dahl is an expert on risk management: "He is an audit, risk management and financial expert from his former chairmanship of the IDACORP, Inc. audit committee, membership on the Dine Brands Global, Inc. audit committee, previous work experience with accounting firm Ernst & Young, and prior licensure as a Certified Public Accountant and Certified Bank Auditor."   Defendant Dahl also served as Director of the Company from 2017-2019.

17.     **Defendant Keith P. Russell** ("Russell") was a Director of the Company during the relevant time period, including from at least 2011 to 2023.

18.     **Defendant Michael J. Kennedy** ("Kennedy") is and has been a Director of the Company since August 1, 2022.

19.     **Defendant William James Scilacci, Jr.** ("Scilacci") is and has been a Director of the Company since 2019.  Defendant Scilacci served at all relevant times as a member of the Executive Committee, as well as a member of the Board's Audit and Risk Committee.  The Company's March 24, 2023 Proxy Statement promotes that Defendant Scilacci has extensive utility experience through his over twenty years in financial management with Southern California Edison, the primary energy supply company for Southern California.  The Proxy Statement states that "Mr. Scilacci has a keen understanding and extensive knowledge of enterprise risk management from his role as Chief Financial Officer of Edison International.  For eight years, Mr. Scilacci managed Edison International's enterprise risk management program identifying, monitoring, and forecasting new risks to the company including ESG related risks such as the impacts of climate change."  Thus, Defendant Scilacci was aware of the material risks posed to the Company due to potential wildfires and had a duty to address and mitigate such risks.  Defendant Scilacci is a citizen of California.

20.     **Defendant Thomas B. Fargo** ("Fargo") is and has been a Director of the Company since 2005.  Defendant Fargo also serves and has served at all relevant times as Chairman of the Board and Chairman of the Executive Committee of the Company, as well as a member of the Board's Compensation & Human Capital Management Committee and the Board's Nominating and Corporate Governance Committee.

21.     **Defendant Mary E. Kipp** ("Kipp") is and has been at all relevant times a Director of the Company and member of its Board's Audit and Risk Committee.  Defendant Kipp has also served as President and Chief Executive Officer, Puget

Sound Energy, Inc., since January 2020.  Previously, Defendant Kipp worked at El Paso Electric Company (NYSE: EE), President 2014-2015, Chief Executive Officer 2015-2017, President and Chief Executive Officer 2017-2019.

22.    **Defendant Alana K. Pakkala** ("Pakkala") is and has been at all relevant times a Director of the Company and member of its Board's Audit and Risk Committee, having joined the Company in 2020.

23.    **Defendant Toby B. Taniguchi** ("Taniguchi") is and has been at all relevant times a Director of the Company and member of its Board's Audit and Risk Committee, having joined the Company in 2021.

24.    **Defendant Kevin M. Burke** ("Burke") was a Company director from 2018 through to 2023. Defendant Burke also served on the Company's Audit & Risk Committee during the Relevant Period.

25.    **Defendant Eva T. Zlotnicka** ("Zlotnicka") was a Company director from 2020 through to 2021.

26.    **Defendant Mary G. Powell** ("Powell") was a Company director from 2019 through to 2021.

27.    The above-named defendants at ¶¶ 7–26 are sometimes referred to herein collectively as the "Director Defendants."

**Officer Defendants**

28.    **Defendant Constance H. Lau** ("Lau") served as the Company's President and Chief Executive Officer ("CEO") from prior to the start of the Relevant Period until January 2022.

29.    **Defendant Paul K. Ito** ("Ito") served as the Company's Interim Chief Financial Officer ("CFO") from July 2022 until January 2023, and has served as the Company's Executive Vice President, ("EVP") Treasurer, and CFO since January 2023.

30.     **Defendant Gregory C. Hazelton** ("Hazelton") served as the Company's Vice President ("VP"), CFO, and Treasurer from prior to the start of the Relevant Period until July 2022.

31.     **Defendant Shelee M. T. Kimura** ("Kimura") has served as the President and CEO of Hawaiian Electric Company since January 2022, having previously served in other senior roles within the Company for years prior to that, since 2004.

32.     **Defendant Tanye S. Y. Sekimura** ("Sekimura") was the Senior Vice President ("SVP") and CFO of the Company up until her retirement on October 1, 2023, after serving the Company for 32 years.

33.     The above-named defendants at ¶¶ 28–32 are referred to herein collectively as the "Officer Defendants".

34.     The Director Defendants and the Officer Defendants are referred to herein as the "Individual Defendants".

35.     The Company and the Individual Defendants are collectively referred to herein as "Defendants."

## FACTS

### Background

36.     Hawaiian Electric, together with its subsidiaries, engages in the electric utility, banking, and non-regulated renewable/sustainable infrastructure investment businesses in the state of Hawaii.   The Company provides service to 95% of Hawaiian residents and operates in three segments, including the Electric Utility segment, which engages in the production, purchase, transmission, distribution, and sale of electricity in the islands of Oahu, Hawaii, Maui, Lanai, and Molokai.

37.     Hawaiian Electric holds itself out as striving "to be one of the most progressive and highest performing companies in the world, serving the energy needs

of each person in Hawaii with purpose, compassion, empathy, and aloha for our fellow humans and our natural environment."[1]

38.    As a utility service based in and serving the citizens of Hawaii, Hawaiian Electric, Inc. is subject to oversight from both federal and state regulators, including by the Hawaii Public Utilities Commission ("PUC").   Accordingly, pursuant to section 8.2 of its General Orders No. 7, the PUC requires that Hawaiian Electric, Inc. "exercise reasonable care to reduce the hazards to which its employees, its customers, and the general public may be subjected." A failure to conform to or comply with this requirement "shall be subject to a civil penalty not to exceed $25,000 for each day such violation, neglect, or failure continues." Haw. Rev. Stat. § 269-28(a). As such, compliance with the PUC's order is imperative for Hawaiian Electric, Inc. as failure to do so could lead to significant penalties.

39.    For an electric utility company, it is essential that their transmission and distribution ("T&D") components – the transmission lines, substations, distribution lines, and transformers which make up the Electricity Delivery Network in the United States[2] - are maintained properly in order to be safe, reliable, and resilient. The electric power industry has certain inherent hazards and risks, primarily due to the fact that the T&D components collectively deliver "[a]pproximately four trillion kWh of electric energy" annually across the United States[3] and T&D components are exposed to a variety of extreme weather events, as well as general wear and tear.

---

[1]    *See*                            https://www.hei.com/company-profile/about-hawaiian-electric/default.aspx (last accessed Dec. 04, 2023).

[2]    *See* U.S. Department of Energy, *Transmission and Distribution Components*, Quadrennial          Technology          Review          2015          (2015), https://www.energy.gov/sites/prod/files/2015/09/f26/QTR2015-3F-Transmission-and-Distribution_1.pdf (last accessed Dec. 04, 2023).

[3]    *Id.*

40.     Accordingly, the Individual Defendants knew of the attendant risks in not properly maintaining their T&D components and were thus responsible for ensuring that the Company met all relevant regulations, and that safety was ensured.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

### 2019 False and Misleading Statements

41.     On February 28, 2019, Hawaiian Electric filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Hazelton, Sekimura, Lau, Ito, Dahl, Fargo, Fowler, Russell, Burke, and Kane. In providing an overview of the Company's business, the 2018 10-K stated:

> *Electric Utility*. Hawaiian Electric and its operating utility subsidiaries, Hawaii Electric Light Company, Inc. (Hawaii Electric Light) and Maui Electric Company, Limited (Maui Electric), are regulated electric public utilities that provide essential electric service to approximately 95% of Hawaii's population through the operation of five separate grids that serve communities on the islands of Oahu, Hawaii, and Maui, Lanai and Molokai. Hawaiian Electric's mission is to provide innovative energy leadership for Hawaii, to meet the needs and expectations of customers and communities, and to empower them with affordable, reliable and clean energy.  The goal is to create a modern, flexible and dynamic electric grid that enables an optimal mix of distributed energy resources (such as private rooftop solar and battery storage), demand response, and grid-scale resources to achieve the statutory goal of 100% renewable energy by 2045.

42.     In discussing the Company's compliance with environmental regulations, the 2018 10-K stated:

> Hawaiian Electric, Hawaii Electric Light and Maui Electric [the "Utilities"], like other utilities, are subject to periodic inspections by federal, state and, in some cases, local environmental regulatory agencies, including agencies responsible for the regulation of water quality, air quality, hazardous and other waste and hazardous materials. These inspections may result in the identification of items needing corrective or other action. Except as otherwise disclosed in this report [.

11

. .], ***the Company believes that each subsidiary has appropriately responded to environmental conditions requiring action and that, as a result of such actions, such environmental conditions will not have a material adverse effect on the Company or Hawaiian Electric.*** [Emphasis added].

43.    In discussing the Company's executive overview and strategy for its electric utility segment, the 2018 10-K stated:

The Utilities provide electricity on all the principal islands in the state, other than Kauai, to approximately 95% of the state's population, and operate five separate grids. ***The Utilities' mission is to provide innovative energy leadership for Hawaii, to meet the needs and expectations of customers and communities, and to empower them with affordable, reliable and clean energy.*** The goal is to create a modern, flexible, and dynamic electric grid that enables an optimal mix of distributed energy resources, such as private rooftop solar, demand response, and grid-scale resources to enable the creation of smart, sustainable, resilient communities and achieve the statutory goal of 100% renewable energy by 2045.  [Emphasis added].

44.    Appended to the 2018 10-K as an exhibit was a signed certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Lau, Sekimura, and Hazelton, attesting that "[t]he consolidated information contained in the [2018 10-K] fairly presents, in all material respects, the financial condition and results of operations of [the Company] and its subsidiaries as of, and for, the periods presented in this report."

45.    Then, on March 25, 2019, the Company filed its Proxy Statement on Schedule 14A with the SEC, solicited by Defendants Lau, Dahl, Fargo, Fowler, and Russell ("2019 Proxy Statement"). The 2019 Proxy Statement solicited, *inter alia*: (i) the election of Defendants Connors, Fargo, and Scilacci to the Board; (ii) approval of the extension of the term of the Company's Nonemployee Director stock plan and increase the shares available for issuance thereunder; and (iii) approval of executive compensation.

46.    The 2019 Proxy Statement contained the following information, in relevant part:

Culture and Our Teammates

**We are dedicated to creating a better Hawaii**. We reflect this commitment through our efforts to provide products and services that enhance our customers' lives, and **in our work to protect Hawaii's unique environment**, strengthen our economy, support our communities and act with integrity and accountability.

Our board oversees and works with management to find and cultivate the talent our organization needs to continue delivering value for our shareholders, customers and communities. **Our employees are committed to the company's foundational values: integrity, excellence, aloha and safety** …

Our Focus on Risk Oversight

**The board spends a significant time on risk oversight**. We have a board-approved consolidated enterprise risk management system designed to identify and assess risk across the HEI enterprise and report risks to the board, along with proposed strategies for mitigating such risks.

At least annually, the board conducts a strategic planning and risk review, during which we evaluate the company's fundamental financial and business strategies and assess major risks facing the company and options to mitigate those risks …

(Emphasis added).

47.    Meanwhile, the 2019 Proxy Statement failed to disclose that the Company had inadequate wildfire prevention protocols, their procedures were inadequate to meet the challenges for which they were ostensibly designed, and despite knowing the degree of risk that wildfires posed to Maui and the Company's inadequate safety protocols and procedures placed Maui at a heightened risk of

13

devastating wildfires. Had shareholders known of these facts then they would not have approved the above-solicited proposals.

48.  On August 2, 2019, Hawaiian Electric filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2019 (the "Q2 2019 10-Q"). The Q2 2019 10-Q was signed by Defendants Lau, Sekimura, and Hazelton. The Q2 2019 10-Q contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed, *supra*, in ¶ 43.

49.  On November 1, 2019, Hawaiian Electric filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2019 (the "Q3 2019 10-Q"). The Q3 2019 10-Q was signed by Defendants Lau, Sekimura, and Hazelton. The Q3 2019 10-Q contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed, *supra*, in ¶ 43.

50.  The above-referenced statements were false and misleading at relevant times. In particular, the individual statements that: (i) "the Company believes that each subsidiary has appropriately responded to environmental conditions requiring action and that, as a result of such actions, such environmental conditions will not have a material adverse effect on the Company or Hawaiian Electric;" and (ii) "[t]he Utilities' mission is to provide innovative energy leadership for Hawaii, to meet the needs and expectations of customers and communities, and to empower them with affordable, reliable and clean energy" were false and misleading when made and/or lacked information necessary to make the statements not misleading because the Individual Defendants failed to disclose that Hawaiian Electric's wildfire prevention and safety protocols and procedures were inadequate to meet the challenges for which they were ostensibly designed and despite knowing the degree of risk that

wildfires posed to Maui and the Company's inadequate safety protocols and procedures placed Maui at a heightened risk of devastating wildfires.

**2020 False and Misleading Statements**

51. On February 28, 2020, Hawaiian Electric filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2019 (the "2019 10-K"). The 2019 10-K was signed by Defendants Lau, Seu, Sekimura, Hazelton, Ito, Connors, Dahl, Fargo, Fowler, Kane, Johns, Russell, Burke, Powell, Zlotnicka, and Scilacci. The 2019 10-K contained substantively similar descriptions of the Company's business, compliance with environmental regulations, and executive overview and strategy of its electric utility segment, as discussed, *supra*, in ¶¶ 42–43.

52. In addition, in discussing the Company's environmental, social and governance ("ESG") risks and opportunities, the 2019 10-K stated:

> [ESG] considerations have long been an integral part of HEI's strategy to be a "catalyst for a better Hawaii" for the benefit of all stakeholders. The Company firmly believes that effective management of its ESG risks and opportunities creates a strategic business advantage; improves the lives of our employees, through focus on employee health, wellness, safety, empowerment and increased engagement; improves the sustainability, well-being and resilience of our communities, the state and the environment; and ultimately leads to sustained long-term value creation for our investors.
>
> ***The [Hawaiian Electric] Board of Directors is responsible for the oversight of the Company's enterprise risk management (ERM) programs, which are designed to address all material risks and opportunities, including ESG considerations***. The Board of Directors has delegated the day-to-day responsibility to execute on these action plans to management. The Company believes ESG considerations are embedded in our daily actions and drive how we engage with our employees, communities, and shareholders.
>
> The Company intends to leverage the frameworks developed by the Task Force on Climate-related Financial Disclosure (TCFD) and the

Sustainability Accounting Standards Board (SASB) to communicate our approach and progress on ESG matters in future filings.

We are committed to achieving a renewable, sustainable energy future, providing leadership in corporate social responsibility, and adhering to governance best practices.  [Emphasis added].

53.    Appended to the 2019 10-K as an exhibit was a signed certification pursuant to SOX by Defendants Lau, Seu, Sekimura, and Hazelton, attesting that "[t]he consolidated information contained in the [2019 10-K] fairly presents, in all material respects, the financial condition and results of operations of [the Company] and its subsidiaries as of, and for, the periods presented in this report."

54.    Then, on March 26, 2020, the Company filed its Proxy Statement on Schedule 14A with the SEC, solicited by Defendants Lau, Connors, Dahl, Fargo, Fowler, Kane, Powell, Russell, Scilacci, and Zlotnicka (the "2020 Proxy Statement"). The 2020 Proxy Statement solicited, *inter alia*: (i) the election of Defendants Fowler, Russell, Zlotnicka, and Kane to the Board; and (ii) approval of executive compensation.

55.    The 2020 Proxy Statement contained the following information, in relevant part:

**Board Oversight of Strategy and Risk Management: Investing in Hawaii's Sustainable Future**

***Sustainability, or environment, social and governance (ESG), considerations have long been an integral part of HEI's strategy to be a "catalyst for a better Hawaii."*** We firmly believe that effective management of ESG risks and opportunities creates a strategic business advantage; improves the sustainability, well-being and resilience of our communities, our state and our environment; and leads to sustained long-term value creation for our investors.

The Board is responsible for the oversight of HEI's enterprise risk management (ERM) programs, which are designed to address all material risks and opportunities, including ESG considerations. [...]

16

*This past year, our Board prioritized integrating sustainability even further into our governance structures, decision-making processes and reporting. We focused our strategic retreat on climate change and other ESG factors relevant to our companies*. Since then, the HEI companies have been further integrating climate change and ESG factors into strategic planning and ERM processes.

(Emphasis added).

56. Meanwhile, the 2020 Proxy Statement failed to disclose that the Company had inadequate wildfire prevention protocols, their procedures were inadequate to meet the challenges for which they were ostensibly designed, and despite knowing the degree of risk that wildfires posed to Maui and the Company's inadequate safety protocols and procedures placed Maui at a heightened risk of devastating wildfires. Had shareholders known of these facts then they would not have approved the above-solicited proposals.

57. On May 5, 2020, Hawaiian Electric filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2020 (the "Q1 2020 10-Q"). The Q1 2020 10-Q was signed by Defendants Lau, Seu, Sekimura, and Hazelton. The Q1 2020 10-Q contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed, *supra*, in ¶ 43.

58. On August 6, 2020, Hawaiian Electric filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2020 (the "Q2 2020 10-Q"). The Q2 2020 10-Q was signed by Defendants Lau, Seu, Sekimura, and Hazelton. The Q2 2020 10-Q contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed, *supra*, in ¶ 43.

59.   On September 15, 2020, Hawaiian Electric issued a press release announcing that the Company had released its first ESG report (the "2019 ESG Report").  The press release stated:

> Hawaiian Electric [. . .] today released its first consolidated report describing its policies, actions and performance data with respect to [ESG] and sustainability-related matters.  Such reports are frequently referred to as "ESG" reports and are becoming increasingly common as investors seek to understand how public companies are impacting the environment and society, as well as potential opportunities and risks to companies' long-term financial and operational strength.
>
> "We're proud to issue our first consolidated [Hawaiian Electric] ESG report to help customers, employees, investors and other stakeholders understand how [Hawaiian Electric's] strategies and operations advance ESG outcomes and create long-term value for all stakeholders," said [Defendant Lau[.]]
>
> "While this is our first consolidated [Hawaiian Electric] ESG report, ESG principles and sustainability have long been fundamental values of [Hawaiian Electric], so much so that we've often said that ESG is in our DNA. With all of our operations in the middle of the Pacific Ocean, we know that our company' long-term health is inextricably linked with the strength of the economy, communities, and environment of the Hawaiian Islands. This linkage is all the more clear in the context of the COVID-19 pandemic, and we're working hard to help our customers, employees and communities through this period and to help our economy recover," said Lau.

60.   That same day, Hawaiian Electric published its 2019 ESG Report. In discussing sustainability governance, the 2019 ESG Report stated:

> We see ESG-related strategies and risks as having the same potential as other strategies and risks to impact long-term value creation. As such, we've integrated material ESG factors into company governance structures and management activities.  Just like other strategies and risks, we're identifying, measuring, managing and assigning accountability for material ESG issues.
>
> Company strategies are overseen by the Board as a whole and are

18

managed through our strategic planning and oversight process. The Board provides guidance on strategic priorities and plans, including at its annual strategic retreat, and approves the budget to allocate resources for agreed upon strategies.

***Our full Board reviews and provides input on major risks for our companies and determines our risk appetite. This includes risks relating to safety and potential physical risk to utility infrastructure or to bank loan collateral from climate change impacts***. The [Hawaiian Electric] Audit & Risk Committee assists the Board in its risk oversight role by overseeing our Enterprise Risk Management (ERM) program, which is designed to identify and assess key risks across the [Hawaiian Electric] enterprise and report such risks to the Board, along with strategies for mitigating such risks. The Hawaiian Electric Audit & Risk Committee and the ASB Audit Committee and Risk Committee assist in risk oversight of those subsidiaries.

The [Hawaiian Electric] Nominating & Corporate Governance Committee (NCG Committee) reviews strategies and risks involving governance and assesses leadership development and succession planning to ensure we have the right leadership to execute our strategies. The role of the NCG Committee has recently expanded to include review of human capital management and ensuring ESG oversight. [Emphasis added].

61. Further in discussing environmental commitment and management, the 2019 ESG Report stated:

Our customers and communities expect that through our daily operations we will protect our air and water, reduce waste, and conserve natural resources. More than 30 environmental professionals, including scientists, engineers, chemists, and a wildlife biologist work full-time at our company to ensure that employees and external contractors understand and comply with all applicable environmental laws, regulations, permitting requirements and procedures regarding air and water quality, noise control, hazardous materials, and protected species.

Our Environmental Division's mission is to ensure that the company fulfills its kuleana, responsibility, to protect Hawai'i's unique environment through environmental compliance and stewardship and

timely, innovative, cost-effective Environmental Management Programs and Standard Operating Procedures, which are comprehensive and formalized.

Critical elements of the programs and procedures include year-round risk and opportunities assessment, continuous improvement, compliance management and tracking, air and water quality monitoring, and extensive environmental compliance training in air quality requirements, spill prevention control and countermeasures, storm water runoff, proper handling and disposal of hazardous materials, and protected species awareness and protection.   All contractors and subcontractors working at Hawaiian Electric sites are required to attend Contractor Environmental Orientation training, conducted by our environmental staff.

Internal audits are conducted to verify compliance with environmental permits, regulations and policies, and fulfill corporate risk management requirements.  Our internal Corporate Audit Team audits the Environmental Division at least once every three years. Audit reports are used to create Management Action Plans, ensuring that highest risk items are given priority and addressed in a timely manner. The Environmental Division also performs periodic environmental compliance audits of our company facilities to identify areas for improvement.

62. Finally, in discussing the Company's purported commitment to safety, the 2019 ESG Report stated:

Safety is our number one priority at Hawaiian Electric. Our goal is to provide a safe and healthy work environment, where every employee makes safety a central part of his or her job.

Our safety commitment is to provide and support:

- Managerial responsibility for health and safety issues
- ***Procedures for hazard identification and safety risk assessment***
- Operating health and safety guidelines, procedures, and policies
- ***Emergency planning and preparedness procedures***
- Safety performance monitoring, measurement, and reporting
- Internal and external health and safety audits.  [Emphasis added].

20

63.     On November 6, 2020, Hawaiian Electric filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2020 (the "Q3 2020 10-Q").  The Q3 2020 10-Q was signed by Defendants Lau, Seu, Sekimura, and Hazelton. The Q3 2020 10-Q contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed, *supra*, in ¶ 43.

64.     The above-referenced statements were false and misleading at relevant times.  In particular, the individual statements that: (i) "Our full Board reviews and provides input on major risks for our companies and determines our risk appetite. This includes risks relating to safety and potential physical risk to utility infrastructure […];" (ii) "Audit reports are used to create Management Action Plans, ensuring that highest risk items are given priority and addressed in a timely manner;" (iii) "Safety is our number one priority at Hawaiian Electric;" and (iv) that the Company's "safety commitment is to provide" "[p]rocedures for hazard identification and safety risk assessment," and "[e]mergency planning and preparedness procedures" were false and misleading when made and/or lacked information necessary to make the statements not misleading because the Individual Defendants failed to disclose that Hawaiian Electric's wildfire prevention and safety protocols and procedures were inadequate to meet the challenges for which they were ostensibly designed and despite knowing the degree of risk that wildfires posed to Maui and the Company's inadequate safety protocols and procedures placed Maui at a heightened risk of devastating wildfires.

## 2021 False and Misleading Statements

65.     On February 26, 2021, Hawaiian Electric filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2020 (the "2020 10-K").  The 2020 10-K was signed by Defendants Lau, Seu, Sekimura, Johns, Ajello, Hazelton, Ito, Connors, Dahl, Fargo,

Fowler, Kane, Pakkala, Russell, Burke, Powell, Zlotnicka, and Scilacci. The 2020 10-K contained substantively similar descriptions of the Company's business, compliance with environmental regulations, executive overview and strategy of its electric utility segment, and purported commitment to ESG principles as discussed, *supra*, at ¶¶ 42–43, and 62.

66.    Appended to the 2020 10-K as an exhibit was a signed certification pursuant to SOX by Defendants Lau, Seu, Sekimura, and Hazelton, attesting that "[t]he consolidated information contained in the [2020 10-K] fairly presents, in all material respects, the financial condition and results of operations of [the Company] and its subsidiaries as of, and for, the periods presented in this report."

67.    Then, on March 26, 2021, the Company filed its Proxy Statement on Schedule 14A with the SEC, solicited by Defendants Lau, Connors, Dahl, Fargo, Fowler, Kane, Powell, Russell, Scilacci, and Zlotnicka (the "2021 Proxy Statement"). The 2021 Proxy Statement solicited, *inter alia*: (i) election of Defendants Dahl, Kane, and Lau to the Board; and (ii) approval of executive compensation.

68.    The 2021 Proxy Statement contained the following information, in relevant part:

Board Oversight of ESG Strategy and Risk Management

***We firmly believe that effective management of ESG risks and opportunities creates a strategic advantage; improves the sustainability, well-being and resilience of our communities, our economy and our environment; and leads to sustained long-term value creation for our investors***.

[…]

In 2020, our Board fully integrated material ESG factors into the company's governance structures and oversight of management activities. We expanded the responsibilities of the Nominating & Corporate Governance Committee to include overseeing human capital

management and ensuring all material ESG areas have appropriate oversight.

[…]

The new performance-based regulation (PBR) framework, developed with our regulators and stakeholders, ***further incentivizes the utility to achieve ESG outcomes relating to increasing renewable energy, facilitating customer participation in the clean energy transition, modernizing our grid*** and advancing affordability and customer equity…

(Emphasis added).

69.    Meanwhile, the 2021 Proxy Statement failed to disclose that the Company had inadequate wildfire prevention protocols, their procedures were inadequate to meet the challenges for which they were ostensibly designed, and despite knowing the degree of risk that wildfires posed to Maui and the Company's inadequate safety protocols and procedures placed Maui at a heightened risk of devastating wildfires. Had shareholders known of these facts then they would not have approved the above-solicited proposals.

70.    On April 22, 2021, Hawaiian Electric issued a press release announcing that the Company had issued a consolidated ESG report (the "2020 ESG Report"). The press release stated:

Hawaiian Electric [. . .] today released an updated consolidated report describing its policies, actions and performance with respect to a number of [ESG] matters, including climate-related risks and opportunities.

***

"With all of our operations in the middle of the Pacific Ocean, we know that our company's long-term health is inextricably linked with the strength of the economy, communities, and environment of the Hawaiian Islands. That's why ESG and sustainability considerations are

at the core of our mission to be a catalyst for a better Hawai'i," said
[Defendant] Lau[.]

"Since issuing our inaugural ESG report last fall, we have continued our
cross-enterprise work to further integrate ESG and climate-related
factors into our governance, strategies, risk management and reporting.
This second consolidated ESG report provides an update on our ESG
efforts and reflects our commitment to continuous improvement,
transparency and accountability surrounding these very important
issues," said Lau.

71.     That same day, Hawaiian Electric published its 2020 ESG Report.  The
2020 ESG Report contained substantively similar descriptions of the Company's
policies regarding sustainability governance and risk management, environmental
management, and purported commitment to safety as discussed, *supra*, in ¶¶ 60–62.

72.     On May 10, 2021, Hawaiian Electric filed a Quarterly Report on Form
10-Q with the SEC, reporting the Company's financial and operating results for the
quarter ended March 31, 2021 (the "Q1 2021 10-Q").  The Q1 2021 10-Q was signed
by Defendants Lau, Seu, Sekimura, and Hazelton. The Q1 2021 10-Q contained a
substantively similar description of the Company's executive overview and strategy
for its electric utility segment as discussed, *supra*, in ¶ 43.

73.     On August 9, 2021, Hawaiian Electric filed a Quarterly Report on Form
10-Q with the SEC, reporting the Company's financial and operating results for the
quarter ended June 30, 2021 (the "Q2 2021 10-Q").  The Q2 2021 10-Q was signed
by Defendants Lau, Seu, Sekimura, and Hazelton. The Q2 2021 10-Q contained a
substantively similar description of the Company's executive overview and strategy
for its electric utility segment as discussed, supra, in ¶ 43.

74.     On November 5, 2021, Hawaiian Electric filed a Quarterly Report on
Form 10-Q with the SEC, reporting the Company's financial and operating results for
the quarter ended September 30, 2021 (the "Q3 2021 10-Q").  The Q3 2021 10-Q
was signed by Defendants Lau, Seu, Sekimura, and Hazelton. The Q3 2021 10-Q

24

contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed, *supra*, in ¶ 43.

75. The above-referenced statements were false and misleading at relevant times. In particular, the same statements described, *supra*, at ¶ 64 and repeated by the Company in its 2021 filings were false and misleading when made and/or lacked information necessary to make the statements not misleading because the Individual Defendants failed to disclose that Hawaiian Electric's wildfire prevention and safety protocols and procedures were inadequate to meet the challenges for which they were ostensibly designed and despite knowing the degree of risk that wildfires posed to Maui and the Company's inadequate safety protocols and procedures placed Maui at a heightened risk of devastating wildfires.

**2022 False and Misleading Statements**

76. On February 25, 2022, Hawaiian Electric filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K was signed by Defendants Seu, Hazelton, Sekimura, Johns, Ajello, Kimura, Ito, Connors, Dahl, Fargo, Flores, Fowler, Kane, Taniguchi, Pakkala, Russell, Burke, and Scilacci. The 2021 10-K contained substantively similar descriptions of the Company's business, compliance with environmental regulations, executive overview and strategy of its electric utility segment, and purported commitment to ESG principles as discussed, *supra*, in ¶¶ 42–43 and 62.

77. Appended to the 2021 10-K as an exhibit was a signed certification pursuant to SOX by Defendants Seu, Sekimura, Kimura, and Hazelton, attesting that "[t]he consolidated information contained in the [2021 10-K] fairly presents, in all material respects, the financial condition and results of operations of [the Company] and its subsidiaries as of, and for, the periods presented in this report."

78.     On March 18, 2022 the Company filed its Proxy Statement on Schedule 14A with the SEC, solicited by Defendants Connors, Dahl, Fargo, Flores, Fowler, Kane, Russell, Scilacci, and Seu (the "2022 Proxy Statement"). The 2022 Proxy Statement solicited, *inter alia*: (i) the election of Defendants Connors, Dahl, Fargo, Flores, Kane, Scilacci, and Seu to the Board; and (ii) approval of executive compensation.

79.     The 2022 Proxy Statement contained the following information, in relevant part:

Board Oversight of Strategy and Risk Management

Effective management of risks and opportunities improves the sustainability, well-being and resilience of our communities, our state and our environment […]

As a Board, we see ESG-related strategies and risks as having the same potential as other strategies and risks to impact long-term value creation. As a result, we deliberately composed our Board to ensure we have directors who have direct experience related to ESG topics, including renewable energy, climate change strategy and environmental management.

Our full Board reviews and provides input on our strategies and major risks and determines our risk appetite. ***This includes risks relating to safety, other human capital considerations and climate change***.

[…]

*        *        *

**[] Hawaiian Electric** – Focused on achieving aggressive climate goals in a way that is affordable, ***reliable and resilient*** for our customers.

(Emphasis added)

80.     Meanwhile, the 2022 Proxy Statement failed to disclose that the Company had inadequate wildfire prevention protocols, their procedures were

26

inadequate to meet the challenges for which they were ostensibly designed, and despite knowing the degree of risk that wildfires posed to Maui and the Company's inadequate safety protocols and procedures placed Maui at a heightened risk of devastating wildfires. Had shareholders known of these facts then they would not have approved the above-solicited proposals.

81.     On April 12, 2022, Hawaiian Electric issued a press release announcing that the Company had issued a consolidated ESG report (the "2021 ESG Report"). The press release quoted Defendant Seu, stating: "[o]ur ESG progress demonstrates our commitment not only to operating a sustainable business, but also to building a sustainable Hawai'i in which our children and grandchildren, our communities, our customers and our fellow employees will thrive together now and for generations to come," and "[o]ur company has been serving Hawai'i for over 130 years, and this deep-felt mindset comes naturally to us as a longstanding business in our island state. The alignment between ESG principles, state policy in Hawai'i, community expectations, and our goals as a company has never been stronger."

82.     That same day, Hawaiian Electric published the 2021 ESG Report.  The 2021 ESG Report contained substantively similar descriptions of the Company's policies regarding sustainability governance and risk management, environmental management, and purported commitment to safety as discussed, *supra*, in ¶¶ 60–62.

83.     In addition, in discussing reliability and resilience, the 2021 ESG Report stated:

We are focused on ensuring the resilience of our system.  Our efforts include:

- Using advanced climate risk modeling to access risks and inform our planning process

- Deploying advanced meters and other technologies that allow us to respond more quickly to system interruptions

- ***Developing damage prediction modeling to estimate damage and***

*outages from severe natural event scenarios in order to support resilience planning efforts*

- Developing plans for community microgrids and/or critical customer hubs to be able to quickly restore power to critical customers

- Building more modern and efficient power plants inland, away from the coastline. An example is the Schofield Generating Station, which was completed and brought online in 2018. The biofuel-capable generating facility is located on military property inland at a higher elevation. It can be isolated to serve the military base and other critical facilities in the event of an emergency, and feeds electricity to the grid that serves all O'ahu customers the rest of the time.

- Collaborating with key partners, such as military, to supply energy to customers during an emergency

- Engaging with stakeholders to incorporate resilience needs and priorities through our Integrated Grid Planning process, including its Resilience Working Group.

*** 

We continually maintain and upgrade our transmission and distribution system to ensure seamless delivery of power to our customers. Day-to-day maintenance is a key part of keeping the grid resilient. We regularly inspect our poles, lines, and other equipment, and work to replace and upgrade aging and faulty equipment before failures happen. We regularly trim the vegetation around our equipment, as many power outages during high winds and storms are due to tree branches or other vegetation falling onto power lines. We have also replaced traditional power lines with insulated conductor systems to improve reliability and resilience in targeted areas prone to vegetation-related outages.

We're working to reduce the impact of outages by adding devices to section off parts of the grid to reduce the number of customers affected by an outage. We have also completed distribution protection studies to improve safety and mitigate risk on each of the five islands we serve.

We measure and report reliability performance using metrics commonly used in the electric utility industry regarding the duration and frequency of power interruptions for customers.

Both the company (through performance incentives) and executives (through executive compensation goals) have financial incentives to promote strong reliability performance.

We are working on a multi-year plan and PUC application focused on foundational investments in transmission and distribution system resilience. Our proposed plan will include:

- Strengthening our most critical transmission lines to withstand extreme winds

- Hardening distribution lines serving critical community lifeline facilities such as hospitals, military sites, communications infrastructure, water and wastewater facilities, ports and emergency response facilities

- Upgrading specific poles to improve restoration after a storm or hurricane

- Moving lines underground in targeted areas prone to vegetation-related damage

- Removing large trees that are at risk of falling into lines during a storm

- ***Strengthening lines and deploying devices to help prevent and respond to wildfires***

- Installing equipment in select substations to reduce flood impacts. [Emphasis added].

84.    In discussing wildfire prevention and mitigation, the 2021 ESG Report stated:

Episodic drought, a warming climate and the expansion of nonnative fire-prone grasses and shrubs has led to an increase in wildfires in

Hawai'i. 98% of wildfires in Hawai'i are human caused and the threat to communities is high year-round. In addition to the utility's own wildfire mitigation plans, we have joined with community members and wildfire collaborators to help prevent and mitigate wildfires in known hot spots across our service areas. As members of the Wai'anae Wildfire Hui in West O'ahu and Pacific Fire Exchange on Maui, we meet monthly to share ideas and discuss priority projects. We support the Hawai'i Wildfire Management Organization on Hawai'i Island, which works with communities across the state on wildfire planning, prevention and mitigation activities. By raising awareness, implementing key land management practices and collaborating on projects, these organizations are working to reduce the wildfire risk in Hawai'i and build strong, resilient communities.

85.    On May 9, 2022, Hawaiian Electric filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2022 (the "Q1 2022 10-Q"). The Q1 2022 10-Q was signed by Defendants Seu, Sekimura, Kimura, and Hazelton. The Q1 2022 10-Q contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed, *supra*, in ¶ 43.

86.    On August 8, 2022, Hawaiian Electric filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2022 (the "Q2 2022 10-Q"). The Q2 2022 10-Q was signed by Defendants Seu, Sekimura, Kimura, and Ito. The Q2 2022 10-Q contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed, *supra*, in ¶ 43.

87.    On November 7, 2022, Hawaiian Electric filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2022 (the "Q3 2022 10-Q"). The Q3 2022 10-Q was signed by Defendants Seu, Sekimura, Kimura, and Ito. The Q3 2022 10-Q contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed, *supra*, in ¶ 43.

88.    The above-referenced statements were false and misleading at relevant times.  In particular, the same statements described, *supra*, at ¶ 64 and repeated by the Company in its 2022 filings as well as: (i) "[w]e are focused on ensuring the resilience of our system" by "[d]eploying advanced meters and other technologies that allow us to respond more quickly to system interruptions," "[d]eploying damage prediction modeling to estimate damage and outages from severe natural event scenarios in order to support resilience planning efforts;" (ii) [w]e continually maintain and upgrade our transmission and distribution system to ensure seamless delivery of power to our customers;" (iii) [w]e regularly inspect our poles, lines, and other equipment, and work to replace and upgrade aging and faulty equipment before failures happen;" (iv) [w]e regularly trim the vegetation around our equipment, as many power outages during high winds and storms are due to tree branches or other vegetation falling onto power lines;" and (v) "[w]e support the Hawai'i Wildfire Management Organization on Hawai'i Island, which works with communities across the state on wildfire planning, prevention and mitigation activities" were false and misleading when made and/or lacked information necessary to make the statements not misleading.

89.    The Individual Defendants failed to disclose that, *inter alia*, Hawaiian Electric's wildfire prevention and safety protocols and procedures were inadequate to meet the challenges for which they were ostensibly designed and despite knowing the degree of risk that wildfires posed to Maui and the Company's inadequate safety protocols and procedures placed Maui at a heightened risk of devastating wildfires, as well as the fact that the Company did not maintain its equipment and in fact had old, decaying equipment that went without necessary maintenance.

**2023 False and Misleading Statements**

90.    On February 27, 2023, Hawaiian Electric filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for

the year ended December 31, 2022 (the "2022 10-K").  The 2022 10-K was signed by Defendants Seu, Ito, Sekimura, Kimura, Johns, Ajello, Connors, Dahl, Fargo, Flores, Fowler, Kane, Otani, Kipp, Pakkala, Taniguchi, Russell, Kennedy, and Scilacci. The 2022 10-K contained substantively similar descriptions of the Company's business, compliance with environmental regulations, executive overview and strategy of its electric utility segment, and purported commitment to ESG principles, as discussed, *supra*, in ¶¶ 42–43 and 62.

91.    Appended to the 2022 10-K as an exhibit was a signed certification pursuant to SOX by Defendants Seu, Sekimura, Kimura, and Ito, attesting that "[t]he consolidated information contained in the [2022 10-K] fairly presents, in all material respects, the financial condition and results of operations of [the Company] and its subsidiaries as of, and for, the periods presented in this report."

92.    On March 24, 2023 the Company filed its Proxy Statement on Schedule 14A with the SEC, solicited by Defendants Connors, Dahl, Fargo, Flores, Fowler, Kane, Kennedy, Otani, Russell, Scilacci, and Seu (the "2023 Proxy Statement"). The 2023 Proxy Statement solicited, *inter alia*: (i) the election of Defendants Connors, Dahl, Fargo, Flores, Fowler, Kane, Kennedy, Otani, Scilacci, and Seu to the Board; and (ii) approval of executive compensation.

93.    The 2023 Proxy Statement contained the following information, in relevant part:

Board Oversight of Strategy and Risk Management

Effective management of risks and opportunities leads to sustained long-term value creation for our investors and ***improves the sustainability, well-being and resilience of our communities, our state and our environment***.

Our full Board reviews and provides input on our strategies and major risks and determines our risk appetite. ***This includes risks relating to a number of topics, including but not limited to, safety, other human capital considerations and climate change***. […]

As a Board, we consider ESG-related strategies and risks in the context of our overall company strategies and risks. As such, we have integrated oversight of ESG risks and opportunities into our existing Board and committee responsibilities. In considering our Board composition, we also ensure we have directors who have direct experience related to ESG topics relevant to our strategies, including renewable energy, climate change strategy and environmental management.

\*     \*     \*

HEI's Enterprise Risk Management (ERM) function is principally responsible for identifying and monitoring risk at the holding company and its subsidiaries, and for reporting on high-risk areas to the Board and designated Board committees. *As a result, all HEI directors, including those who serve on the Compensation & Human Capital Management Committee, are apprised of risks that could reasonably be expected to have a material adverse effect on HEI*.

(Emphasis added)

94.     Meanwhile, the 2023 Proxy Statement failed to disclose that the Company had inadequate wildfire prevention protocols, their procedures were inadequate to meet the challenges for which they were ostensibly designed, and despite knowing the degree of risk that wildfires posed to Maui and the Company's inadequate safety protocols and procedures placed Maui at a heightened risk of devastating wildfires. Had shareholders known of these facts then they would not have approved the above-solicited proposals.

95.     On April 4, 2023, Hawaiian Electric issued a press release announcing that the Company had released its latest ESG report (the "2022 ESG Report"). The press release stated:

Hawaiian Electric [. . .] today announced the publication of its newest consolidated report describing its updated policies, actions and performance for 2022 with respect to a range of environmental, social and governance (ESG) matters. This is HEI's fourth annual ESG report.

"Our [Hawaiian Electric] family of companies is guided by a common purpose to create a better Hawai'i – one that is thriving economically, environmentally, culturally and socially," said [Defendant] Seu[.] "We believe this purpose serves the long-term interests of all of our stakeholders – it inspires us to act in ways that allow us not simply to advance, but to leap forward into a future that's brighter for us all."

The theme of HEI's latest ESG report is "Laulima," which translates to "many hands working together." The report details the work of all of the [Hawaiian Electric] companies in 2022 toward their common purpose, including in areas such as decarbonization; economic health and affordability; reliability and resilience diversity, equity and inclusion; and human capital management.

96.    That same day, Hawaiian Electric published its 2022 ESG Report.  The 2022 ESG Report contained substantively similar descriptions of the Company's policies regarding sustainability governance and risk management, environmental management, purported commitment to safety, reliability and resilience, and wildfire prevention and mitigation, as discussed, *supra*, in ¶¶ 60–62 and 83–84.

97.    On May 9, 2023, Hawaiian Electric filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2023 (the "Q1 2023 10-Q").  The Q1 2023 10-Q was signed by Defendants Seu, Sekimura, Kimura, and Ito. The Q1 2023 10-Q contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed, *supra*, in ¶ 43.

98.    On August 7, 2023, Hawaiian Electric filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2023 (the "Q2 2023 10-Q").  The Q2 2023 10-Q was signed by Defendants Seu, Sekimura, Kimura, and Ito. The Q2 2023 10-Q contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed, *supra*, in ¶ 43.

99.    The above-referenced statements were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Hawaiian Electric's wildfire prevention and safety protocols and procedures were inadequate to meet the challenges for which they were ostensibly designed; (ii) accordingly, despite knowing the degree of risk that wildfires posed to Maui, the Company's inadequate safety protocols and procedures placed Maui at a heightened risk of devastating wildfires; (iii) the fact that the Company did not maintain its equipment and in fact had old, decaying equipment that went without necessary maintenance; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

### THE TRUTH EMERGES

100.   On August 8, 2023, a wildfire broke out in Maui when power lines belonging to Hawaiian Electric fell down in high winds which ultimately led to at least 97 deaths and between $4 billion to $6 billion in losses from property damage and business interruption.   Following this, the Individual Defendants' false and misleading statements began to unravel when it became apparent that Hawaiian Electric's wildfire prevention and safety protocols were inadequate, that the Individual Defendants knew Hawaiian Electric's protocols were in adequate, and that the Individual Defendants failed to make Hawaiian Electric's protocols adequate, thus placing Maui and its citizens at a heightened risk of wildfires.

101.   On August 12, 2023, news outlets began reporting that Hawaiian Electric did not have a plan to shut off power in advance of the Hawaii wildfires. For example, in an article entitled "Hawaii utility faces scrutiny for not cutting power to reduce fire risks," the *Washington Post* stated:

> Four days before fast-moving brush fires engulfed parts of Maui, weather forecasters warned authorities that powerful wind gusts would

35

trigger dangerous fire conditions across much of the island and Hawaii.

The state's electric utility responded with some preemptive steps but did not use what is widely regarded as the most aggressive but effective safety measure: shutting down the power.

Hawaiian Electric, the utility that oversees Maui Electric and provides service to 95 percent of the state's residents, did not deploy what's known as a "public power shutoff plan," which involves intentionally cutting off electricity to areas where big wind events could spark fires. A number of states, including California, have increasingly adopted this safety strategy after what were then the nation's most destructive and deadliest modern fires, in 2017 and 2018.

Hawaiian Electric was aware that a power shut-off was an effective strategy, documents show, but had not adopted it as part of its fire mitigation plans, according to the company and two former power and energy officials interviewed by The Washington Post. Nor, in the face of predicted dangerous winds, did it act on its own, utility officials said, fearing uncertain consequences.

The decision to avoid shutting off power is reflective of the utility's struggles to bolster its aging and vulnerable infrastructure against wildfires, said Jennifer Potter, who lives in Lahaina and was a member of the Hawaii Public Utilities Commission until just nine months ago.

"They were not as proactive as they should have been," Potter said about Hawaiian Electric's fire-prevention planning, adding that there had not been any real meaningful action to "address some of those inadequacies in terms of wildfire." Doug McLeod, a former energy commissioner for Maui County, also said the utility was aware of the need for a regular shut-down system and to bury lines, especially given the "number of close calls in the past."

Earlier this week, high winds caused widespread damage to utility infrastructure. The intense gusts knocked down about 30 utility poles across the region, many onto trees and roads, complicating evacuations, according to Maui County Mayor Richard Bissen. He confirmed that some electrical lines were energized when they hit the ground.

36

102.   On this news, Hawaiian Electric's stock price fell $10.94 per share, or 33.76%, to close at $21.46 per share on August 14, 2023.

103.   Then, on August 16, 2023, *The Wall Street Journal* published an article entitled "Hawaiian Electric Is in Talks With Restructuring Firms." The article stated:

Hawaiian Electric is speaking with firms that specialize in restructuring advisory work, exploring options to address the electric utility's financial and legal challenges arising from the Maui wildfires, said people familiar with the matter.

Hawaiian Electric is facing a sell off in its stock and bonds, and has been hit with lawsuits alleging that its actions both before and during the wildfires exacerbated the devastation Maui residents have suffered.

The company is in discussions over the strategies it can pursue and to determine whether it needs to hire legal and financial advisers, the people said.

On Thursday evening, a day after the publication of this report, a company spokesperson said: "Like any company in this situation would do, and as we do in the normal course of business, we are seeking advice from experts—the goal is not to restructure the company but to endure as a financially strong utility that Maui and this state need."

More customer lawsuits are expected in coming weeks to increase the costs of defending and settling claims for Hawaiian Electric just as its access to financing is being threatened.

S&P Global Ratings downgraded Hawaiian Electric's credit rating to junk on Tuesday, saying the wildfires destroyed a significant segment of the company's customer base and will take many years to restore. S&P also said that wildfire lawsuits seeking compensation for injuries, deaths and property damage will weigh on the company's credit quality.

104.   On August 17, 2023, *The Wall Street Journal* published an article entitled "Hawaiian Electric Knew of Wildfire Threat, but Waited Years to Act." The article stated:

During the 2019 wildfire season, one of the worst Maui had ever seen,

Hawaiian Electric concluded that it needed to do far more to prevent its power lines from emitting sparks.

The utility examined California's plans to reduce fires ignited by power lines, started flying drones over its territory and vowed to take steps to protect its equipment and its customers from the threat of fire.

Nearly four years later, the company has completed little such work. Between 2019 and 2022, it invested less than $245,000 on wildfire-specific projects on the island, regulatory filings show. It didn't seek state approval to raise rates to pay for broad wildfire-safety improvements until 2022, and has yet to receive it.

Now, the company is facing scrutiny, litigation and a financial crisis over indications that its power lines might have played a role in igniting the deadliest U.S. wildfire in more than a century. The blaze has caused at least 110 deaths destroyed the historic town of Lahaina and resulted in an estimated billions of dollars in damage.

The fire's cause hasn't been determined, but mounting evidence suggests the utility's equipment was involved. One video taken by a resident shows a downed power line igniting dry grass along a road near Lahaina. A firm that monitors grid sensors reported dozens of electrical disruptions in the hours before the fire began, including one that coincided in time with video footage of a flash of light from power lines.

Hawaiian Electric said it would investigate any role its infrastructure may have played and cooperate with a separate probe into the fire launched last week by the Hawaii attorney general.

"We all believe it's important to understand what happened. And I think we all believe it's important to make sure it doesn't happen again," said Shelee Kimura, Hawaiian Electric's chief executive.

In response to questions about its wildfire-mitigation spending, a spokesman for Hawaiian Electric said the company reduces wildfire risk through its routine utility work, including trimming or removing trees and upgrading, replacing and inspecting equipment. It said it has spent about $84 million on maintenance and tree work in Maui County since 2018.

The utility has long been a force in Hawaii politics and business. In the wake of the fire, its finances are reeling. Its stock has plunged 49% this week, and its credit rating was downgraded to junk by S&P.

*** 

At the end of 2019, Hawaiian Electric issued a press release about wildfire risk. It said it would install heavier, insulated conductors on Maui and Oahu to minimize the risk of sparks when winds picked up, as well as technology to detect disruptions when the conductors came into contact with vegetation or each other. It said it would apply fire retardant on poles in risky areas and consider installing cameras and other devices to monitor weather conditions during fire season.

In filings over the next two years with the Hawaii Public Utilities Commission, which is tasked with approving utility projects and spending, the company made only passing reference to wildfire mitigation.

105.    Following the publications of *The Wall Street Journal* articles, Hawaiian Electric's stock price fell $2.54 per share, or 17.43% to close at $12.03 per share on August 17, 2023.

106.    On August 27, 2023, Hawaii Electric issued a press release wherein the Company admitted that its electrical equipment started the Maui wildfire, stating "[a] fire at 6:30 a.m. (the "Morning Fire") appears to have been caused by power lines that fell in high winds." The Company, however, disclaimed any responsibility for the second fire that ignited later that same day, despite the fire breaking out in the same area as the Morning Fire and the evidence pointing to the second fire being a continuation of the Morning Fire caused by the Company.

107.    As a result of the foregoing, the Company's share price has suffered an immense fall from a Relevant Period high of $55.15 on March 18, 2020 to $13.27 on December 6, 2023, representing a total 75.94% decrease in the Company's share price as a result of the wrongdoing as alleged herein.

## THE INDIVIDUAL DEFENDANTS' KNOWLEDGE

108.     Throughout the Relevant Period, the Individual Defendants knew that Hawaiian Electric's wildfire prevention and safety protocols and procedures were inadequate to meet the challenges for which they were ostensibly designed and despite knowing the degree of risk that wildfires posed to Maui, the Company's inadequate safety protocols and procedures placed Maui at a heightened risk of devastating wildfire. Despite their knowledge, the Individual Defendants continued to issue the above false and misleading statements and failed to omit facts necessary to make their statements not false and misleading.

109.     In 2018, and the years following, the Hawaii Wildfire Management Organization identified Lahaina as a hotspot for potential wildfires due to the area's dry, windy, and hot characteristics. Moreover, in 2020, Lahaina was identified as a High-Risk Wildfire Area in the Maui County Hazard Mitigation Plan Update.

110.     The Individual Defendants knew that the Company's electrical infrastructure was in dire need of repair as in 2019, the Company concluded that it needed to do more to prevent its powerlines from emitting sparks.

111.     The Individual Defendants also knew that the Company did not use any wildfire prevention technologies on its T&D components, such as covered conductors, underground powerlines, composite powerlines, and non-expulsion fuses, thus increasing the risk of causing a wildfire.

112.     The Individual Defendants also knew that the Company had caused wildfires on the island previously. In August 2018, a fallen powerline started a fire which covered 2,000 acres and damaged over 20 homes. Moreover, the Individual Defendants knew, or ought to have known, of previous fires caused by other electrical utility companies across the country, including Pacific, Gas & Electric Company ("PG&E") in California, PacifiCorp in Oregon, and SoCal Edison in California.

113.    According to a 2019 filing by the Company, its 60,000 poles were vulnerable due to their age and the fact that Hawaii is in a "severe wood decay hazard zone." The 2019 filing admitted that the Company had not replaced the aged wooden poles and acknowledged the "serious public hazard" if the poles failed. These poles, according to Maui News, were built to an "obsolete 1960's standard" and were leaning and near the end of their life span. Despite this, the Individual Defendant failed to ensure the Company complied with modern day standards and allowed old and decayed poles to pose a serious risk to the public. The Company admitted in its 2022 PUC application that it needed funds to strengthen electrical poles and that over $6.2 million would be required for "wildfire prevention & mitigation on Maui," and that $40 million in capital improvements/repairs would be needed to help prevent wildfires more generally.

114.    Despite the foregoing at ¶¶ 108–114, the Individual Defendants drastically underfunded their wildfire-specific projects between 2019 and 2022, spending only a mere $245,000 on such projects.  In fact, the Individual Defendants did not seek approval to raise their rates to pay for necessary wildfire-safety improvements until 2022 and refused to approve capital spending on ageing T&D components and wildfire prevention for years prior. The Individual Defendants thus neglected wildfire prevention and increased the risk of a wildfire occurring while, at the same time, falsely and misleadingly touting that the Company was addressing safety issues in its SEC filings.

115.    The Individual Defendants were made aware of, or should have been aware of, the causal link between hurricanes and wildfires caused by T&D components. In 2020, researchers from the University of Hawaii and the East-West Center published a report in the American Meteorological Society Journal a report entitled "Fire and Rain: The Legacy of Hurricane Lane in Hawai'i." The report found that the fires on Maui and O'ahu following Hurricane Lane was not caused by

41

thunderstorms and lightning. Instead, the Honolulu Fire Department found that the O'ahu fire was caused by power lines arcing in Hurricane Lane's high winds.

116.     Moreover, the Company knew that other utility companies had a power shutoff system to protect against wildfires in high winds yet failed to implement the same. San Diego Gas & Electric implemented such a system over a decade ago to prevent causing wildfires, PG&E also implemented a power shutoff system in 2019 following a fire its equipment caused, and the California PUC opened Order Instituting Rulemaking (OIR) 18-12-005 to examine its rules allowing electric utility companies to shutoff power lines in the event of dangerous conditions. Despite this, the Individual Defendants failed to cause the Company to implement the same power shutoff systems which could have prevented the devastating wildfire in August 2023.

117.     The Company announced in 2019 that they would be using drones to assess fire hazards in drought-prone areas of West Maui. The Individual Defendants had failed to invest sufficiently in its wildfire-prevention programs and in maintaining its T&D components and instead opted to use drones for wildfire identification, as opposed to prevention, as reflected by this announcement.

118.     The Individual Defendants knew, or should have known, that the Company must follow various standards to protect the public from the consequences that follow from vegetation coming into contact with its T&D components, pursuant to HRS § 6-73-11. Accordingly, the Company was required to maintain the areas surrounding and adjacent to certain of its T&D components and ensure sufficient clearance around its power lines. In addition, HRS § 6-73-14 provides that any maintenance issues not specifically addressed by HRS § 6-73-11 "should be done in accordance with accepted good practice for the given local conditions known at the time by those responsible for the construction or maintenance." Despite being under an obligation to conform with these minimum safety standards, the Individual

Defendants failed to cause the Company to comply with those standards thus placing the public at a heightened risk of wildfires caused by the Company's T&D components.

119.    The Individual Defendants knew that in the days leading up to the August 2023 wildfire caused by them that Maui had been in a drought. The Individual Defendants also knew that on August 7, 2023, a red flag warning was issued as high wind gusts of up to 60mph were forecast across Hawaii and that, coupled with the dry conditions could create critical fire conditions. Despite this, the Individual Defendants failed to shut off power in advance of August 8, 2023.

120.    At all relevant times, the Individual Defendants knew the above facts, or at least should have known of them in the exercise of prudent business judgement, yet failed to maintain adequate systems, controls, and programs to prevent wildfires, failed to adequately maintain their T&D components, failed to comply with or cause the Company to comply with minimum safety standards, and failed to prevent the destructive August 2023 wildfire in Maui. Meanwhile, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) Hawaiian Electric's wildfire prevention and safety protocols and procedures were inadequate to meet the challenges for which they were ostensibly designed; (ii) accordingly, despite knowing the degree of risk that wildfires posed to Maui, the Company's inadequate safety protocols and procedures placed Maui at a heightened risk of devastating wildfires; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

## AFTERMATH

**The Individual Defendants Continued**

**To Breach their Fiduciary Duties**

121.    Following the Maui wildfire caused by Hawaiian Electric, the Individual Defendants continued to breach their fiduciary duties to the Company. In

particular, the Individual Defendants caused the Company to remove the fallen and damaged T&D components from nearby a power station in Lahaina from around August 12, 2023.

122.     At the time the T&D components were being removed, the Individual Defendants knew that investigators from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") had not yet arrived to conduct their investigation into the origin and cause of the wildfire in the area. Moreover, the Individual Defendants knew, or should have known, that, according to the National Fire Protection Association, "the integrity of a fire scene needs to be preserved" and that "[e]*vidence should not be handled or removed* without documentation."

123.     This failure to preserve evidence was a direct breach of their fiduciary duties because the Individual Defendants knew that failing to preserve evidence could subject Hawaiian Electric to fines and penalties as the Company had discussed in 2022 the $15 billion settlement by California utility company PG&E for starting a wildfire and failing to preserve the evidence.[4]

**The Impact of the Wildfire on Maui**

124.     The wildfire caused by Hawaiian Electric had a devastating impact on Maui and its residents. As noted, *supra*, the wildfire led to at least 97 deaths and between $4 billion to $6 billion in losses from property damage and business interruption. It was reported that the residents of Lahaina had a matter of mere

_____

[4]     *See In the Matter of the Application of Hawaiian Electric Company, Inc., et al.*, Docket No. 2022-0135, Application at 23, https://dms.puc.hawaii.gov/dms/DocumentViewer?pid=A1001001A22G01B11309C00934 (last accessed Dec. 7, 2023).

moments to escape the fires which led to many jumping into the ocean and drowning, with others unable to escape and perishing in the fires.

125.    At the time of filing this complaint, the town of Lahaina remains closed to the public and West Maui accommodations started to reopen to visitors slowly under a phased plan, as announced by the Hawaii Tourism Authority.

## DAMAGE TO THE COMPANY

### Securities Class Action

126.    On August 24, 2023, a securities class action complaint was filed in the United States District Court for the Northern District of California against the Company and Defendants Lau, Seu, Hazelton, and Ito. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, in the case captioned: *Bhangal v. Hawaiian Electric Industries, Inc., et al.*, Case No. 3:23-cv-04332 (N.D. Cal.) ("Securities Class Action").

127.    As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers.  The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

### Maui County Lawsuit

128.    On August 24, 2023, the County of Maui filed a civil complaint in this Court against the Company, among other electric utility companies, for negligence, gross negligence, nuisance, ultrahazardous activity, injunctive relief, and trespass seeking damages for the costs that the County of Maui incurred as a result of the August 2023 wildfires in the case captioned: *County of Maui v. Maui Electric Company, et al.*, 2CCV-23-0000238 ("Maui Action").

129.    As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself against this Maui Action.  The Company will continue to incur significant sums in relation to the Maui Action and any liability or settlement that results.

**Regulatory and/or Legal Penalties**

130.    It has been estimated by Capstone that following the August 2023 wildfire caused by Hawaiian Electric, the Company faces potential liability in excess of $4.9 billion, up from a previous estimate of $3.9 billion.[5]

131.    The Company also failed to preserve the wildfire evidence before investigators from the ATF had arrived, in possible violation of national guidelines. As a result, and as the Individual Defendants knew, removing evidence from the site of the wildfire could lead to massive fines being imposed against the Company, as previously happened with PG&E and SoCal Edison.

**Regulatory and Governmental Investigations**

132.    As a result of the Individual Defendants' failures to maintain adequate safety protocols and make needed improvements to its T&D components, the Company is now subject to regulatory and governmental investigations and actions.

133.    On August 31, 2023, it was announced that a governmental investigation had been opened by U.S. Representatives Cathy McMorris Rodgers (R-

---

[5]    *Hawaiian Electric: Revised Model Shows $4.9 in Potential Liabilities from Settlement; Maui County Increasingly Likely to Share Burden*, Capstone (Aug. 30, 2023),    https://capstonedc.com/wp-content/uploads/2023/08/20230830-Hawaiian-Electric-Revised-Model-Shows-4.9B-in-Potential-Liabilities-from-Settlement.pdf (last accessed Dec. 7, 2023).

WA, Chair of the Energy and Commerce Committee), Jeff Duncan (R-SC, Chair of the Energy, Climate, and Grid Security Subcommittee), and Morgan Griffith (R-VA, Chair of the Oversight and Investigations Subcommittee).

134. The Company may also be subject to SEC investigation and action as a result of the false and misleading statements and/or omissions made in the Company's public filings.

135. As a result of the actual and potential investigations and actions, the Company will have to expend significant sums on complying with the investigations, defending itself and certain of the Individual Defendants, and on any penalties or fines that may result.

**Unjust Compensation**

136. At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants, totaling over $50.4 million during the Relevant Period. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company, as follows:

| TOTAL COMPENSATION ($) | | | |
|---|---|---|---|
| **Defendant** | **2019** | **2020** | **2021** | **2022** |
| Seu | - | 2,465,166 | 2,929,665 | 3,811,515 |
| Hazelton | 1,753,663 | 1,877,488 | 2,442,618 | 1,245,484 |
| Sekimura | 1,592,036 | 1,807,150 | 1,419,571 | 910,425 |
| Kimura | - | - | 944,402 | 1,514,176 |
| Ajello | - | 89,471 | 108,500 | 125,500 |
| Johns | 116,671 | 175,603 | 184,000 | 201,750 |
| Fargo | 211,000 | 285,008 | 327,500 | 350,000 |
| Connors | 148,832 | 186,500 | 189,500 | 215,000 |
| Flores | - | - | 105,267 | 232,113 |
| Fowler | 209,720 | 209,500 | 212,500 | 240,000 |
| Kane | 116,283 | 189,500 | 191,000 | 262,333 |
| Scilacci | 157,870 | 196,500 | 198,000 | 231,500 |
| Dahl | 194,128 | 203,066 | 211,000 | 241,500 |

| Lau | 4,902,901 | 5,108,212 | 5,933,523 | - |
|---|---|---|---|---|
| Ito | - | - | - | 815,752 |
| Pakkala | - | 81,085 | 101,000 | 122,378 |
| Taniguchi | - | - | 84,299 | 122,378 |
| Russell | 212,500 | 218,000 | 220,000 | 252,000 |
| Burke | 104,883 | 108,500 | 108,500 | 125,500 |
| Powell | 148,832 | 186,500 | 150,815 | - |
| Zlotnicka | - | 197,932 | 32,225 | - |
| Annual Total | 9,720,487 | 13,585,181 | 16,093,885 | 11,019,304 |
| Relevant Period Total | **$50,418,857** | | | |

137.    Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner.  Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

138.    However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because the Individual Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was excessive and undeserved.  As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damages**

139.    In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

140.     The Company has also been named in numerous other civil lawsuits in the wake of the wildfires and is now subject to the costs of defending itself and any liability or settlement that results, due to the Individual Defendants wrongdoing.

141.     The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

142.     The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

143.     Moreover, on October 2, 2023, the Company revealed in a filing to the PUC that it had only $165 million in annual general liability insurance and $25 million in professional liability insurance which would cover only a small fraction of the potential liability that the Company faces from the above-referenced legal and regulatory actions. Thus, the Company will be unable to rely on insurance coverage for the majority of damages and may have to expend significant sums from its own pocket, thereby further damaging the Company.

## CORPORATE GOVERNANCE

### Code of Conduct

144.     At all relevant times, the Company had in place its Code of Conduct which applied to the "Employees, Officers and Directors" of the Company. The Code of Conduct describes the Company's "core values, which are the fundamental principles that guide the conduct of [the] business." The Code of Conduct requires that everyone "to whom our Code applies must take the time to read, understand and apply the provisions of our Code and report any concerns."

145.     The Code of Conduct further provides that the "Board of Directors and management also have a responsibility to maintain a company culture based on integrity and compliance with all laws […]."

146.     In a section entitled "OUR SHARED RESPONSIBILITY AND COMMITMENT," the Code of Conduct states:

> Each of us has a duty to understand a live by our Code of Conduct ("Code") and to stand by our high standard of ethics. This commitment is our shared responsibility and our success depends on the important decisions we make each day to uphold these obligations.

147.     In the same section, the Code of Conduct describes its core values, which include "put[ting] safety first for our teammates and community. We take responsibility for our personal safety AND the safety of our team," and "[w]e care about our teammates. We care about our community and everyone in it. We care about Hawai'i and its future. This means we will work together, treat each other with respect and dignity, take care of our environment, and give back to our communities."

148.     The Code of Conduct further emphasizes the importance of acting with integrity and makes all employees, officers, and directors accountable for, among other things: (i) "Following all laws and regulations and all Company policies and procedures;" (ii) Being truthful, fair, transparent, responsible, and accurate with customers, regulators, suppliers, shareholders, and other teammates;" (iii) "Protecting our reputation as a trusted local company;" and (iv) "Reporting concerns and violations immediately."

149.     The Code of Conduct also provides that "[o]ne of our responsibilities under the Code is being aware of and addressing all types of risk that affect our work, such as business risk, compliance risk, and reputation risk."

150.     In a section entitled "CODE OF ETHICS FOR SENIOR FINANCIAL OFFICERS," the Code of Conduct states:

**Compliance with Laws, Rules and Regulations**

> As Senior Financial Officers, you must not only comply with applicable laws, rules and regulations, you also have leadership responsibilities

50

with respect to demonstrating honesty and high ethical standards, including ethical handling of actual or apparent conflicts of interest between personal and professional relationships, fostering a work environment that encourages employees to raise concerns and promptly addressing employee compliance concerns identified by you.

**Disclosures in Periodic Reports and Other Public Communications**

As a public company, HEI is required to file various periodic reports with the U.S. Securities and Exchange Commission ("SEC"). It is Company policy to make full, fair, accurate, timely and understandable disclosure in compliance with all applicable laws, rules and regulations in the reports and documents that HEI files with or submits to the SEC and in other public communications made by HEI or its subsidiaries. The Company's Senior Financial Officers are expected to use their best efforts to perform their duties in a manner intended to implement this policy.

151.     Moreover, the Code of Conduct emphasizes the importance of adhering to all legal obligations, which includes maintaining accurate books and records and further emphasizes the importance of reporting violations of the Code of Conduct – a failure to do so could in itself by a violation of the Code of Conduct.

**Audit Committee Charter**

152.     The Audit & Risk Committee Charter was in place at all relevant times and sets forth additional responsibilities on the members of the Audit & Risk Committee ("Audit Committee") – consisting of Defendants Connors, Flores, and Scilacci.  Such additional duties include assisting the Board oversight of (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) risk management and compliance systems and structure; and (iv) the internal audit function.

153.     More specifically, the Audit & Risk Committee Charter states that the Audit Committee shall have the responsibility and authority to, *inter alia*:

[] Review with management and the independent auditor major issues as to the adequacy of the Company's internal controls and any special audit steps adopted and remediation efforts undertaken in light of material control deficiencies and elicit recommendations for the improvement of such internal controls.

[] Oversee the enterprise risk management program of the Company, including by (a) reviewing and discussing the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, (b) discussing policies with respect to risk assessment and risk management, including the guidelines and policies governing the process by which risk assessment and risk management is undertaken, and (c) periodically reporting to the Board the Committee's discussion and findings regarding risk oversight so the entire Board can be responsive to changes in the Company's risk profile.

[] Periodically review the Company's code of conduct (the "Code") and oversee the Company's program and procedures to monitor compliance with the Code, including meeting with the Compliance Officer to discuss potential Code violations that have been reported and the results of the Code compliance program and recommending to the Board proposed revisions to the Code.

154. The Audit & Risk Committee Charter also provides that the "Committee may conduct or authorize investigations into or studies of matters within the Committee's scope of responsibilities."

## DUTIES OF THE DIRECTOR DEFENDANTS

155. As members of the Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

156. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless

disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

157.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

158.    Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

159.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike

manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

160.    Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director

Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

161.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them, as detailed *supra*.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

162.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

163.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

164.    Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.   Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

165.    During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

166.    At the time this derivative lawsuit was commenced, Hawaiian Electric Industries, Inc.'s Board consisted of the following seven directors: Fargo, Seu,

Connors, Flores, Fowler, Kane, and Scilacci (the "HEI Directors"). The Board of Directors of Hawaiian Electric Company, Inc. consisted of the following six directors: Johns, Kimura, Ajello, Kip, Pakkala, and Taniguchi (the "HECO Directors") (together, the "Director Defendants"). All directors served on the Boards during the period during which the Companies engaged in, authorized, or ignored the wrongdoing alleged in this Complaint. Accordingly, Plaintiff must show that a majority of each Board, *i.e.*, four (4) of the HEI Directors, and three (3) of the HECO Directors, cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute it.

167.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

168.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

169.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

170.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged

herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

171.    Demand is also futile because all Director Defendants of both Companies acted in bad faith and breached their duty of loyalty to the Companies by causing the Companies to move evidence about the Maui Fire, thus failing to preserve key evidence in its original location so it could be viewed and analyzed by the ATF. As demonstrated in detail *supra*, the Individual Defendants caused the Company to move utility poles, transformers, and other key evidence to a warehouse before ATF investigators could arrive on the scene.   This conduct impeded investigators' ability to view the evidence in its original location, unadulterated.  The misconduct and evidence spoliation will likely result in substantial fines and penalties being imposed on the Companies.  Breaches of the duties of good faith and loyalty cannot be indemnified. As a result, the Director Defendants of both Companies face a substantial likelihood of personal liability for breaching such duties.  Demand as to all Director Defendants is thus futile.

172.    The Director Defendants cannot consider a demand because (i) their decision to operate Hawaiian Electric in violation of the law is not a protected business decision and (ii) they all face a substantial likelihood of liability for breaching their duties of loyalty and good faith.   These defendants were either informed of Hawaiian Electric's deteriorating and dangerous electric infrastructure and failed to take action or are consciously violating their duty to stay informed about the core business of Hawaiian Electric.  Such a decision could not have been an action taken in good faith and is accordingly not protected by the business judgment rule. Furthermore, the conscious failure of Defendants to act in the face of the overwhelming number of warnings is a breach of the duties of care and loyalty. This breach subjects them to a substantial likelihood of liability.  Since demand on the majority of the Boards is futile, demand is excused.

173.     Despite the Individual Defendants having knowledge of the history of their own misconduct and mismanagement, the current Boards have failed and refused to seek recovery for Hawaiian Electric for any of the misconduct alleged herein.

174.     Hawaiian Electric's directors and top officers pocketed millions of dollars in salaries, bonuses, and directors' fees, further enriching themselves at the expense of the Companies to which they owe fiduciary duties of good faith, honesty, and loyalty.  The Companies' leadership made an active decision to divert money necessary for safety and operational protocols towards other purposes and at the same time approved bonus payments and developed a corporate culture that placed short-term economic gain over long-term profitability.  The Individual Defendants and the Boards of both Companies have caused irreparable financial and reputational harm to each Company.  The directors have for years consciously failed to take responsibility for safeguarding the public against wildfires caused by the Company's electrical equipment. Thus, neither of the Boards could exercise independent objective judgment in deciding whether to bring this action or to vigorously prosecute the claims alleged herein.

## THE HEI DIRECTORS ARE
## NOT INDEPENDENT OR DISINTERESTED

**Defendant Seu**

175.     Defendant Seu not disinterested or independent, and therefore, is incapable of considering demand because he, as President and CEO, is an employee of the Company who derives substantially all of his income from his employment with Hawaiian Electric, making him not independent.  As CEO, Defendant Seu fails both the NYSE's bright-line independence test and the Company's own Director Independence Standards, thus Defendant Seu cannot be considered independent, as admitted by the Company in its 2023 Proxy Statement filed on Schedule DEF 14A

58

with the SEC. As such, Defendant Seu cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

176.   In addition, Defendant Seu receives lucrative compensation in connection with his employment with Hawaiian Electric, having received in excess of $3.8 million in 2022 and in excess of $9.1 million during the Relevant Period. Accordingly, Defendant Seu is not independent from Defendants Fargo, Flores, Fowler, and Kane as they comprise the Compensation & Human Capital Management Committee ("Compensation Committee") and are responsible for evaluating and determining the compensation of executive compensation and applicable benefits, including that of Defendant Seu. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Seu could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

177.   Because of Defendant Seu's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Seu is unable to comply with his fiduciary duties and prosecute this action. Defendant Seu's in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself/herself in the securities fraud class action lawsuit *Bhangal v. Hawaiian Electric Industries, Inc.* 3:23cv04332, brought under the Securities Exchange Act of 1934 (the "Securities Class Action").

178.   Defendant Seu has served as a Company director since 2022. As a director, Defendant Seu was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any

improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Seu failed to fulfil these duties by making and/or permitting the false and misleading statements to be made, not correcting those statements, and by permitting or causing the Company to fail to maintain adequate controls and wildfire prevention strategies and systems.

179.    As a trusted Company director and senior executive officer, Defendant Seu conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

180.    In addition, Defendant Seu signed, and thus personally made the false and misleading statements contained in the 2019, 2020, 2021, and 2022 10-K's and the Quarterly Reports on Form 10-Q as alleged, *supra*.  For this reason, Defendant Seu breached his fiduciary duties and faces and substantial likelihood of liability therefor.

181.    Defendant Seu solicited the 2022 and 2023 Proxy Statements containing the false and misleading statements and was elected to the Board and had his executive compensation approved as a result. Consequently, Defendant Seu breached his fiduciary duties and faces a substantial likelihood of liability therefor.

182.    According to the Company's 2023 Proxy Statement and website, Defendant Seu possesses expertise in the "Utility/Energy Industry," having worked at Hawaiian Electric since 2010 and served as a director at Edison Electric Institute and the Electric Power Research Institute. As a result, Defendant Seu knew the hazards and risks inherent to the energy sector and thus posed by Hawaiian Electric. Despite this, Defendant Seu failed to ensure that the Company maintained its T&D components properly, complied with minimum safety standards, engaged in wildfire prevention, and that the Company operated in a safe manner. As a result of his

1  failures as alleged herein, despite his advanced knowledge and expertise, Defendant

2  Seu faces a substantial likelihood of liability.

3  183.    Defendant Seu is neither independent nor disinterested. Any demand

4  upon Defendant Seu is futile and, thus, excused.

5  **Defendant Fargo**

6  184.    Defendant Fargo has served as a Company director since 2005. As a

7  director, Defendant Fargo was required to, among other things: (i) ensure that the

8  Company complied with its legal and regulatory obligations and requirements; (ii)

9  properly and accurately guide investors and analysts as to the true financial condition

10  of the Company at any given time; (iii) remain informed as to how the Company

11  conducted its operations, make reasonable inquiries, and take steps to correct any

12  improper conditions or practices; and (iv) ensure the Company was operated in a

13  diligent, honest, and prudent manner.  Despite this, Defendant Fargo failed to fulfil

14  these duties by making and/or permitting the false and misleading statements to be

15  made, not correcting those statements, and by permitting or causing the Company to

16  fail to maintain adequate controls and wildfire prevention strategies and systems.

17  185.    As a trusted Company director, Defendant Fargo conducted little, if

18  any, oversight of the scheme to cause the Company to make false and misleading

19  statements, consciously disregarded his duties to monitor such controls over

20  reporting and engagement in the scheme, and consciously disregarded his duties to

21  protect corporate assets.

22  186.    In addition, Defendant Fargo signed, and thus personally made the

23  false and misleading statements contained in the 2018, 2019, 2020, 2021, and 2022

24  10-K's. For this reason, Defendant Fargo breached his fiduciary duties and faces and

25  substantial likelihood of liability therefor.

26  187.    Defendant Fargo solicited the 2019, 2020, 2021, 2022, and 2023

27  Proxy Statements containing the false and misleading statements and was elected to

28

the Board as a result. Consequently, Defendant Fargo breached his fiduciary duties and faces a substantial likelihood of liability therefor.

188.     In connection with his role as a Company director, Defendant Fargo receives substantial compensation. In 2022, Defendant Fargo received a total compensation package in excess of $350,000, as detailed *supra*. With such lucrative compensation, Defendant Fargo cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

189.     Defendant Fargo also has a longstanding relationship with Defendant Ajello. Defendant Fargo currently serves as a Senior Advisor at SKAI Ventures. Meanwhile, Defendant Ajello has served on the Board of SKAI Ventures since 2015. Thus, Defendants Fargo and Ajello have worked together and built a business relationship while at SKAI Ventures. As a result of the foregoing, Defendants Fargo and Ajello are incapable of considering a demand to sue each other.

190.     Defendant Fargo is neither independent nor disinterested. Any demand upon Defendant Fargo is futile and, thus, excused.

**Defendant Connors**

191.     Defendant Connors has served as a Company director since 2019. As a director, Defendant Connors was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Connors failed to fulfil these duties by making and/or permitting the false and misleading statements to be made, not correcting those statements, and by permitting or causing the Company to fail to maintain adequate controls and wildfire prevention strategies and systems.

192.    As a trusted Company director, Defendant Connors conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

193.    During the Relevant Period, Defendant Connors served as a member of HEI's Audit Committee and had certain additional duties by virtue thereof. Such additional duties include assisting the Board oversight of (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) risk management and compliance systems and structure; and (iv) the internal audit function. Despite this, Defendant Connors failed to fulfil these additional duties by permitting the false and misleading statements to be made, failing to ensure the Company's compliance with legal and regulatory safety requirements, and not identifying and addressing the risks to the Company and its reputation as a result of the wrongdoing as alleged herein. Defendant Connors completely abandoned her directorial and Audit Committee duties and faces a substantial likelihood of liability therefor.

194.    In addition, Defendant Connors signed, and thus personally made the false and misleading statements contained in the 2019, 2020, 2021, and 2022 10-K's. For this reason, Defendant Connors breached her fiduciary duties and faces a substantial likelihood of liability therefor.

195.    Defendant Connors solicited the 2019, 2020, 2021, 2022, and 2023 Proxy Statements containing the false and misleading statements and was elected to the Board as a result. Consequently, Defendant Connors breached her fiduciary duties and faces a substantial likelihood of liability therefor.

196.    In connection with her role as a Company director, Defendant Connors receives substantial compensation. In 2022, Defendant Connors received a

total compensation package in excess of $215,000, as detailed *supra*.   With such lucrative compensation, Defendant Connors cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

197.   According to the Company's 2023 Proxy Statement, the Company and its subsidiaries made charitable contributions to nonprofit organizations where Defendant Connors serves as executive officer. As a result, Defendant Connors is not independent as she could not reasonably consider a demand to sue the directors of the Company from which her nonprofit receives donations and risk not receiving those similar contributions again in the future.

198.   Defendant Connors is neither independent nor disinterested. Any demand upon Defendant Connors is futile and, thus, excused.

**Defendant Flores**

199.   Defendant Flores has served as a Company director since 2021. As a director, Defendant Flores was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Flores failed to fulfil these duties by making and/or permitting the false and misleading statements to be made, not correcting those statements, and by permitting or causing the Company to fail to maintain adequate controls and wildfire prevention strategies and systems.

200.   As a trusted Company director, Defendant Flores conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over

reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

201. During the Relevant Period, Defendant Flores served as a member of HEI's Audit Committee and had certain additional duties by virtue thereof. Such additional duties include assisting the Board oversight of (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) risk management and compliance systems and structure; and (iv) the internal audit function. Despite this, Defendant Flores failed to fulfil these additional duties by permitting the false and misleading statements to be made, failing to ensure the Company's compliance with legal and regulatory safety requirements, and not identifying and addressing the risks to the Company and its reputation as a result of the wrongdoing as alleged herein. Defendant Flores completely abandoned her directorial and Audit Committee duties and faces a substantial likelihood of liability therefor.

202. In addition, Defendant Flores signed, and thus personally made the false and misleading statements contained in the 2021 and 2022 10-K's. For this reason, Defendant Flores breached her fiduciary duties and faces and substantial likelihood of liability therefor.

203. Defendant Flores solicited the 2022 and 2023 Proxy Statements containing the false and misleading statements and was elected to the Board as a result. Consequently, Defendant Flores breached her fiduciary duties and faces a substantial likelihood of liability therefor.

204. In connection with her role as a Company director, Defendant Flores receives substantial compensation. In 2022, Defendant Flores received a total compensation package in excess of $232,113, as detailed *supra*. With such lucrative compensation, Defendant Flores cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

205. Defendant Flores is neither independent nor disinterested. Any demand upon Defendant Flores is futile and, thus, excused.

**Defendant Fowler**

206. Defendant Fowler has served as a Company director since 2009. As a director, Defendant Fowler was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Fowler failed to fulfil these duties by making and/or permitting the false and misleading statements to be made, not correcting those statements, and by permitting or causing the Company to fail to maintain adequate controls and wildfire prevention strategies and systems.

207. As a trusted Company director, Defendant Fowler conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

208. In addition, Defendant Fowler signed, and thus personally made the false and misleading statements contained in the 2018, 2019, 2020, 2021, and 2022 10-K's.  For this reason, Defendant Fowler breached her fiduciary duties and faces and substantial likelihood of liability therefor.

209. Defendant Fowler solicited the 2019, 2020, 2021, 2022, and 2023 Proxy Statements containing the false and misleading statements and was elected to the Board as a result. Consequently, Defendant Fowler breached her fiduciary duties and faces a substantial likelihood of liability therefor.

210.     In connection with her role as a Company director, Defendant Fowler receives substantial compensation. In 2022, Defendant Fowler received a total compensation package in excess of $240,000, as detailed *supra*. With such lucrative compensation, Defendant Fowler cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

211.     According to the Company's 2023 Proxy Statement and website, Defendant Fowler possesses expertise in the "Utility/Energy Industry," having previously served on the Board of Portland General Electric. As a result, Defendant Fowler knew the hazards and risks inherent to the energy sector and thus posed by Hawaiian Electric. Despite this, Defendant Fowler failed to ensure that the Company maintained its T&D components properly, complied with minimum safety standards, engaged in wildfire prevention, and that the Company operated in a safe manner. As a result of her failures as alleged herein, despite her advanced knowledge and expertise, Defendant Fowler faces a substantial likelihood of liability.

212.     Defendant Fowler is neither independent nor disinterested. Any demand upon Defendant Fowler is futile and, thus, excused.

**Defendant Kane**

213.     Defendant Kane has served as a Company director since 2019. As a director, Defendant Kane was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Kane failed to fulfil these duties by making and/or permitting the false and misleading statements to be

made, not correcting those statements, and by permitting or causing the Company to fail to maintain adequate controls and wildfire prevention strategies and systems.

214.    As a trusted Company director, Defendant Kane conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

215.    In addition, Defendant Kane signed, and thus personally made the false and misleading statements contained in the 2018, 2019, 2020, 2021, and 2022 10-K's. For this reason, Defendant Kane breached his fiduciary duties and faces a substantial likelihood of liability therefor.

216.    Defendant Kane solicited the 2020, 2021, 2022, and 2023 Proxy Statements containing the false and misleading statements and was elected to the Board as a result. Consequently, Defendant Kane breached his fiduciary duties and faces a substantial likelihood of liability therefor.

217.    In connection with his role as a Company director, Defendant Kane receives substantial compensation. In 2022, Defendant Kane received a total compensation package in excess of $262,333, as detailed *supra*. With such lucrative compensation, Defendant Kane cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

218.    According to the Company's 2023 Proxy Statement, the Company and its subsidiaries made charitable contributions to nonprofit organizations where Defendant Kane serves as executive officer. As a result, Defendant Kane is not independent as he could not reasonably consider a demand to sue the directors of the Company from which his nonprofit receives donations and risk not receiving those similar contributions again in the future.

219.     Defendant Kane also has a longstanding relationship with Defendant Kimura. Defendant Kane is currently a Trustee of Kamehameha Schools, having held this position since 2009. Meanwhile, Defendant Kimura presently serves on the Audit Committee of Kamehameha Schools. Thus, Defendants Kane and Kimura have worked together and built a business relationship while at Kamehameha Schools. As a result of the foregoing, Defendants Kane and Kimura are incapable of considering a demand to sue each other.

220.     Defendant Kane is neither independent nor disinterested. Any demand upon Defendant Kane is futile and, thus, excused.

**Defendant Scilacci**

221.     Defendant Scilacci has served as a Company director since 2019. As a director, Defendant Scilacci was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Scilacci failed to fulfil these duties by making and/or permitting the false and misleading statements to be made, not correcting those statements, and by permitting or causing the Company to fail to maintain adequate controls and wildfire prevention strategies and systems.

222.     As a trusted Company director, Defendant Scilacci conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

223.     During the Relevant Period, Defendant Scilacci served as the Chair of HEI's Audit Committee and had certain additional duties by virtue thereof. Such additional duties include assisting the Board oversight of (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) risk management and compliance systems and structure; and (iv) the internal audit function. Despite this, Defendant Scilacci failed to fulfil these additional duties by permitting the false and misleading statements to be made, failing to ensure the Company's compliance with legal and regulatory safety requirements, and not identifying and addressing the risks to the Company and its reputation as a result of the wrongdoing as alleged herein. Defendant Scilacci completely abandoned his directorial and Audit Committee duties and faces a substantial likelihood of liability therefor.

224.     In addition, Defendant Scilacci signed, and thus personally made the false and misleading statements contained in the 2019, 2020, 2021, and 10-K's. For this reason, Defendant Scilacci breached his fiduciary duties and faces and substantial likelihood of liability therefor.

225.     Defendant Scilacci solicited the 2019, 2020, 2021, 2022, and 2023 Proxy Statements containing the false and misleading statements and was elected to the Board as a result. Consequently, Defendant Scilacci breached his fiduciary duties and faces a substantial likelihood of liability therefor.

226.     In connection with his role as a Company director, Defendant Scilacci receives substantial compensation. In 2022, Defendant Scilacci received a total compensation package in excess of $231,500, as detailed *supra*. With such lucrative compensation, Defendant Scilacci cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

227.     According to the Company's 2023 Proxy Statement and website, Defendant Scilacci possesses expertise in the "Utility/Energy Industry," having

previously held positions within Southern California Edison, including Senior Vice President and CFO. Defendant Scilacci is reputed as "one of the top CFOs in the electric utility sector." As a result, Defendant Scilacci knew the hazards and risks inherent to the energy sector and thus posed by Hawaiian Electric. Despite this, Defendant Scilacci failed to ensure that the Company maintained its T&D components properly, complied with minimum safety standards, engaged in wildfire prevention, and that the Company operated in a safe manner. As a result of his failures as alleged herein, despite his advanced knowledge and expertise, Defendant Scilacci faces a substantial likelihood of liability.

228.    Defendant Scilacci is neither independent nor disinterested. Any demand upon Defendant Scilacci is futile and, thus, excused.

## THE HECO DIRECTORS ARE
## <u>NOT INDEPENDENT OR DISINTERESTED</u>

**Defendant Kimura**

229.    Defendant Kimura not disinterested or independent, and therefore, is incapable of considering demand because she, as President and CEO, is an employee of the Company who derives substantially all of his income from his employment with Hawaiian Electric, making her not independent.  As CEO, Defendant Kimura fails both the NYSE's bright-line independence test and the Company's own Director Independence Standards, as admitted by the Company in Hawaiian Electric's Exhibit 99.1 attached to its 2023 Annual Report.  As such, Defendant Kimura cannot independently consider any demand to sue herself for breaching his fiduciary duties to the Company, because that would expose her to liability and threaten his livelihood.

230.    In addition, Defendant Kimura receives lucrative compensation in connection with her employment with the Company, having received in excess of $1.5 million in 2022. Accordingly, Defendant Kimura is not independent from

Defendants Fargo, Flores, Fowler, and Kane as they comprise the Compensation & Human Capital Management Committee ("Compensation Committee") and are responsible for evaluating and determining the compensation of executive compensation and applicable benefits, including that of Defendant Kimura. Because of her status as an inside director, and the concomitant substantial compensation she receives, Defendant Kimura could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for her financial future.

231. Defendant Kimura has served as a Company director since 2022. As a director, Defendant Kimura was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Kimura failed to fulfil these duties by making and/or permitting the false and misleading statements to be made, not correcting those statements, and by permitting or causing the Company to fail to maintain adequate controls and wildfire prevention strategies and systems.

232. As a trusted Company director and senior executive officer, Defendant Kimura conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

233. In addition, Defendant Kimura signed, and thus personally made the false and misleading statements contained in the 2021 and 2022 10-K's and the Quarterly Reports filed on Form 10-Q as alleged, *supra*. For this reason, Defendant

Kimura breached her fiduciary duties and faces and substantial likelihood of liability therefor.

234.    Defendant Kimura also has a longstanding relationship with Defendant Kane. Defendant Kimura presently serves on the Audit Committee of Kamehameha Schools. Meanwhile, Defendant Kane is currently a Trustee of Kamehameha Schools, having held this position since 2009. Thus, Defendants Kimura and Kane have worked together and built a business relationship while at Kamehameha Schools. As a result of the foregoing, Defendants Kimura and Kane are incapable of considering a demand to sue each other.

235.    Additionally, Defendant Kimura has worked at the Company since 2004, having held many positions over the years, thus gaining significant experience and knowledge of the electric utility sector. As a result, Defendant Kimura knew the hazards and risks inherent to the energy sector and thus posed by Hawaiian Electric. Despite this, Defendant Kimura failed to ensure that the Company maintained its T&D components properly, complied with minimum safety standards, engaged in wildfire prevention, and that the Company operated in a safe manner. As a result of her failures as alleged herein, despite her advanced knowledge and expertise, Defendant Kimura faces a substantial likelihood of liability.

236.    Because of Defendant Kimura's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Kimura is unable to comply with her fiduciary duties and prosecute this action.

237.    Defendant Kimura is neither independent nor disinterested. Any demand upon Defendant Kimura is futile and, thus, excused.

**Defendant Johns**

238.    Defendant Johns has served as a Company director since 2005 and Chairman since 2020. As a director, Defendant Johns was required to, among other

things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Johns failed to fulfil these duties by making and/or permitting the false and misleading statements to be made, not correcting those statements, and by permitting or causing the Company to fail to maintain adequate controls and wildfire prevention strategies and systems.

239. As a trusted Company director, Defendant Johns conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

240. During the Relevant Period, Defendant Johns served as Chair of HECO's Audit Committee and had certain additional duties by virtue thereof. Such additional duties include assisting the Board oversight of (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) risk management and compliance systems and structure; and (iv) the internal audit function. Despite this, Defendant Johns failed to fulfil these additional duties by permitting the false and misleading statements to be made, failing to ensure the Company's compliance with legal and regulatory safety requirements, and not identifying and addressing the risks to the Company and its reputation as a result of the wrongdoing as alleged herein. Defendant Johns completely abandoned his directorial and Audit Committee duties and faces a substantial likelihood of liability therefor.

241.     In addition, Defendant Johns signed, and thus personally made the false and misleading statements contained in the 2019, 2020, 2021, and 2022 10-K's. For this reason, Defendant Johns breached his fiduciary duties and faces and substantial likelihood of liability therefor.

242.     In connection with his role as a Company director, Defendant Johns receives substantial compensation. In 2022, Defendant Johns received a total compensation package in excess of $201,000, as detailed *supra*. With such lucrative compensation, Defendant Johns cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

243.     Defendant Johns is neither independent nor disinterested. Any demand upon Defendant Johns is futile and, thus, excused.

**Defendant Ajello**

244.     Defendant Ajello has served as a Company director since 2020. As a director, Defendant Ajello was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Ajello failed to fulfil these duties by making and/or permitting the false and misleading statements to be made, not correcting those statements, and by permitting or causing the Company to fail to maintain adequate controls and wildfire prevention strategies and systems.

245.     As a trusted Company director, Defendant Ajello conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over

reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

246.     During the Relevant Period, Defendant Ajello served as a member of HECO's Audit Committee and had certain additional duties by virtue thereof. Such additional duties include assisting the Board oversight of (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) risk management and compliance systems and structure; and (iv) the internal audit function. Despite this, Defendant Johns failed to fulfil these additional duties by permitting the false and misleading statements to be made, failing to ensure the Company's compliance with legal and regulatory safety requirements, and not identifying and addressing the risks to the Company and its reputation as a result of the wrongdoing as alleged herein. Defendant Ajello completely abandoned his directorial and Audit Committee duties and faces a substantial likelihood of liability therefor.

247.     In addition, Defendant Ajello signed, and thus personally made the false and misleading statements contained in the 2020, 2021, and 2022 10-K's. For this reason, Defendant Ajello breached his fiduciary duties and faces and substantial likelihood of liability therefor.

248.     In connection with his role as a Company director, Defendant Ajello receives substantial compensation. In 2022, Defendant Ajello received a total compensation package of $125,500, as detailed *supra*. With such lucrative compensation, Defendant Ajello cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

249.     Defendant Ajello also has a longstanding relationship with Defendant Fargo. Defendant Ajello has served on the Board of SKAI Ventures since 2015. Meanwhile, Defendant Fargo also currently serves as a Senior Advisor at SKAI Ventures. Thus, Defendants Ajello and Fargo have worked together and built a

business relationship while at SKAI Ventures. As a result of the foregoing, Defendants Ajello and Fargo are incapable of considering a demand to sue each other.

250.    Additionally, Defendant Ajello has previously served as Senior Vice President and CFO of Portland General Electric, President of Resilient Energy Solutions LLC, and held other senior roles at Reliant Energy, Inc, thus gaining significant experience within the energy utility sector. As a result, Defendant Ajello knew the hazards and risks inherent to the energy sector and thus posed by Hawaiian Electric. Despite this, Defendant Ajello failed to ensure that the Company maintained its T&D components properly, complied with minimum safety standards, engaged in wildfire prevention, and that the Company operated in a safe manner. As a result of his failures as alleged herein, despite his advanced knowledge and expertise, Defendant Ajello faces a substantial likelihood of liability.

251.    Defendant Ajello is neither independent nor disinterested. Any demand upon Defendant Ajello is futile and, thus, excused.

**Defendant Kipp**

252.    Defendant Kipp has served as a Company director since January 2023. As a director, Defendant Kipp was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Kipp failed to fulfil these duties by making and/or permitting the false and misleading statements to be made, not correcting those statements, and by permitting or causing

the Company to fail to maintain adequate controls and wildfire prevention strategies and systems.

253.   As a trusted Company director, Defendant Kipp conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

254.   During the Relevant Period, Defendant Kipp served as a member of HECO's Audit Committee and had certain additional duties by virtue thereof. Such additional duties include assisting the Board oversight of (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) risk management and compliance systems and structure; and (iv) the internal audit function. Despite this, Defendant Johns failed to fulfil these additional duties by permitting the false and misleading statements to be made, failing to ensure the Company's compliance with legal and regulatory safety requirements, and not identifying and addressing the risks to the Company and its reputation as a result of the wrongdoing as alleged herein. Defendant Kipp completely abandoned her directorial and Audit Committee duties and faces a substantial likelihood of liability therefor.

255.   In addition, Defendant Kipp signed, and thus personally made the false and misleading statements contained in the 2022 10-K. For this reason, Defendant Kipp breached her fiduciary duties and faces and substantial likelihood of liability therefor.

256.   Additionally, Defendant Kipp has previously served as President and CEO of Puget Sound Energy, Inc., President and CEO of El Paso Electric Company, and held roles within the Federal Energy Regulatory Commission, thus gaining significant experience within the energy utility sector. As a result, Defendant Kipp

knew the hazards and risks inherent to the energy sector and thus posed by Hawaiian Electric. Despite this, Defendant Kipp failed to ensure that the Company maintained its T&D components properly, complied with minimum safety standards, engaged in wildfire prevention, and that the Company operated in a safe manner. As a result of her failures as alleged herein, despite her advanced knowledge and expertise, Defendant Kipp faces a substantial likelihood of liability.

257.    In connection with her role as a Company director, Defendant Kipp receives substantial compensation. With such lucrative compensation, Defendant Kipp cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

258.    Defendant Kipp is neither independent nor disinterested. Any demand upon Defendant Kipp is futile and, thus, excused.

**Defendant Pakkala**

259.    Defendant Pakkala has served as a Company director since 2020. As a director, Defendant Pakkala was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Pakkala failed to fulfil these duties by making and/or permitting the false and misleading statements to be made, not correcting those statements, and by permitting or causing the Company to fail to maintain adequate controls and wildfire prevention strategies and systems.

260.    As a trusted Company director, Defendant Pakkala conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements,  consciously  disregarded  her  duties  to  monitor  such  controls  over

reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

261.    During the Relevant Period, Defendant Pakkala served as a member of HECO's Audit Committee and had certain additional duties by virtue thereof. Such additional duties include assisting the Board oversight of (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) risk management and compliance systems and structure; and (iv) the internal audit function. Despite this, Defendant Pakkala failed to fulfil these additional duties by permitting the false and misleading statements to be made, failing to ensure the Company's compliance with legal and regulatory safety requirements, and not identifying and addressing the risks to the Company and its reputation as a result of the wrongdoing as alleged herein. Defendant Pakkala completely abandoned her directorial and Audit Committee duties and faces a substantial likelihood of liability therefor.

262.    In addition, Defendant Pakkala signed, and thus personally made the false and misleading statements contained in the 2020, 2021, and 2022 10-K's. For this reason, Defendant Pakkala breached her fiduciary duties and faces and substantial likelihood of liability therefor.

263.    In connection with her role as a Company director, Defendant Pakkala receives substantial compensation. In 2022, Defendant Pakkala received a total compensation package in excess of $122,000, as detailed *supra*. With such lucrative compensation, Defendant Pakkala cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

264.    According to the Company's Exhibit 99.1 attached to the 2023 Annual Report, entities in which Defendant Pakkala or her family members have an ownership interest engaged in business with American Savings Bank – a wholly owned subsidiary of the Company in which Defendants Seu, Dahl, and Otani serve

on the Board. As a result of this business engagement, Defendant Pakkala is not independent from the Company nor Defendants Seu, Dahl, and Otani and could not reasonably consider a demand to sue these directors.

265.    Defendant Pakkala is neither independent nor disinterested. Any demand upon Defendant Pakkala is futile and, thus, excused.

**Defendant Taniguchi**

266.    Defendant Taniguchi has served as a Company director since 2021. As a director, Defendant Taniguchi was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Taniguchi failed to fulfil these duties by making and/or permitting the false and misleading statements to be made, not correcting those statements, and by permitting or causing the Company to fail to maintain adequate controls and wildfire prevention strategies and systems.

267.    As a trusted Company director, Defendant Taniguchi conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

268.    During the Relevant Period, Defendant Taniguchi served as a member of HECO's Audit Committee and had certain additional duties by virtue thereof. Such additional duties include assisting the Board oversight of (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and

regulatory requirements; (iii) risk management and compliance systems and structure; and (iv) the internal audit function. Despite this, Defendant Taniguchi failed to fulfil these additional duties by permitting the false and misleading statements to be made, failing to ensure the Company's compliance with legal and regulatory safety requirements, and not identifying and addressing the risks to the Company and its reputation as a result of the wrongdoing as alleged herein. Defendant Taniguchi completely abandoned his directorial and Audit Committee duties and faces a substantial likelihood of liability therefor.

269.    In addition, Defendant Taniguchi signed, and thus personally made the false and misleading statements contained in the 2021 and 2022 10-K's. For this reason, Defendant Taniguchi breached his fiduciary duties and faces and substantial likelihood of liability therefor.

270.    In connection with his role as a Company director, Defendant Taniguchi receives substantial compensation. In 2022, Defendant Taniguchi received a total compensation package in excess of $122,000, as detailed *supra*. With such lucrative compensation, Defendant Taniguchi cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

271.    Defendant Taniguchi is neither independent nor disinterested. Any demand upon Defendant Taniguchi is futile and, thus, excused.

**Additional Reasons Demand is Futile**

272.    The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

273.    The Company, at all material times, had its Code of Conduct and related corporate governance policies which required each of the Director Defendants

to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures.  Yet, despite this Code of Conduct, and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

274.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

275.    The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board.  They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

276.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the

Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

277. Publicly traded companies, such as Hawaiian Electric, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

278. Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the board is futile and, thus, excused.

## FIRST CAUSE OF ACTION

### (Against The Individual Defendants for Breach of Fiduciary Duties)

279. Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

280. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

281. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

282. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual

Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

283.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

284.   As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Against the Individual Defendants for Waste of Corporate Assets)

285.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

286.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

287.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of

dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

288.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

### THIRD CAUSE OF ACTION

### (Against The Individual Defendants for Unjust Enrichment)

289.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

290.     By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched by at least $50.4 million at the expense of, and to the detriment of, the Company, as detailed *supra*.

291.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

292.     Plaintiff, as a shareholder and representative of the Company seeks restitution from Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

///

///

///

///

**FOURTH CAUSE OF ACTION**

**(Against Defendants Lau, Seu, Hazelton, and Ito For Contribution Under**
**Sections 10(b) and 21D of the Securities Exchange Act of 1934)**

293.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

294.    The Company, along with Defendants Lau, Seu, Hazelton, and Ito, are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

295.    The Securities Class Action alleges that the class members relied, directly or indirectly, upon the false and misleading statements and omissions, as alleged herein, in purchasing the Company securities. The Securities Class Action further alleges that, as a direct and proximate result, the class members suffered damages because the value of their investments were artificially inflated by the false and misleading statements and omissions, they purchased such securities at the artificially inflated prices, and the value of their investments fell when the truth was eventually revealed, causing economic losses to the class members.

296.    If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Defendants Lau, Seu, Hazelton, and Ito's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

297.    Defendants Lau, Seu, Hazelton, and Ito, because of their positions of control and authority as senior executive officers of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

298.     Accordingly, Lau, Seu, Hazelton, and Ito are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

299.     As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Lau, Seu, Hazelton, and Ito.

### FIFTH CAUSE OF ACTION

**(Against the Proxy Defendants for Violations of**

**<u>Section 14(a) of the Securities Exchange Act of 1934</u>)**

300.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

301.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

302.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

303.     Under the direction and watch of Defendants Connors, Dahl, Fargo, Flores, Fowler, Kane, Kennedy, Otani, Kennedy, Powell, Zlotnicka, Russell, Scilacci, and Seu (together, the "Proxy Defendants"), each of the 2019, 2020, 2021,

2022, and 2023 Proxy Statements (together, the "Proxy Statements") failed to disclose that: (i) Hawaiian Electric's wildfire prevention and safety protocols and procedures were inadequate to meet the challenges for which they were ostensibly designed; (ii) accordingly, despite knowing the degree of risk that wildfires posed to Maui, the Company's inadequate safety protocols and procedures placed Maui at a heightened risk of devastating wildfires; (iii) the fact that the Company did not maintain its equipment and in fact had old, decaying equipment that went without necessary maintenance; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

304. The Proxy Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

305. Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their causing the Company to engage in improper accounting practices and issue false and misleading statements and/or omissions of material fact.

306. In the exercise of reasonable care, the Proxy Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, election of directors and approval of executive compensation.

307.    The misrepresentations and omissions set forth herein were material to shareholders in voting on the proposals in the Proxy Statements who would not have approved, *inter alia*: (i) the election of Defendants Connors, Dahl, Fargo, Flores, Fowler, Kane, Kennedy, Otani, Scilacci, Russell, Zlotnicka, Lau, and Seu to the Board; (ii) approval of the extension of the term of the Company's Nonemployee Director stock plan and increase the shares available for issuance thereunder; and (iii) the compensation of the Company's executive officers.

308.    As a result of the respective Proxy Defendants causing the 2019 Proxy Statement to be false and misleading, Company shareholders approved the proposals set forth therein, including, *inter alia*: (i) the re-election of Defendants Connors, Fargo, and Scilacci to the Board of Directors; (ii) approval of the extension of the term of the Company's Nonemployee Director stock plan and increase the shares available for issuance thereunder; and (iii) approving executive compensation.

309.    As a result of the respective Proxy Defendants causing the 2020 Proxy Statement to be false and misleading, Company shareholders approved the proposals set forth therein, including, *inter alia*: (i) the election of Defendants Fowler, Russell, Zlotnicka, and Kane to the Board of Directors; and (ii) approving executive compensation.

310.    As a result of the respective Proxy Defendants causing the 2021 Proxy Statement to be false and misleading, Company shareholders approved the proposals set forth therein, including, *inter alia*: (i) the election of Defendants Dahl, Kane, and Lau to the Board of Directors; and (ii) approving executive compensation.

311.    As a result of the respective Proxy Defendants causing the 2022 Proxy Statement to be false and misleading, Company shareholders approved the proposals set forth therein, including, *inter alia*: (i) the election of Defendants Connors, Dahl, Fargo, Flores, Kane, Scilacci, and Seu to the Board of Directors; and (ii) approving executive compensation.

312.    As a result of the respective Proxy Defendants causing the 2023 Proxy Statement to be false and misleading, Company shareholders approved the proposals set forth therein, including, *inter alia*: (i) the election of Defendants Connors, Dahl, Fargo, Flores, Fowler, Kane, Kennedy, Otani, Scilacci, and Seu to the Board of Directors; and (ii) approving executive compensation.

313.    The Company was damaged as a result of the Proxy Defendants' material misrepresentations and omissions in the Proxy Statements.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgement as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties, waste of corporate assets, and unjust enrichment;

C.    Against Defendants Lau, Seu, Hazelton, and Ito and in favor of the Company for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934;

D.    Against the Proxy Defendants for their violations of Section 14(a) of the Securities Exchange Act of 1934;

E.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

F.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

1        G.    Granting such other and further relief as the Court deems just and

2   proper.

3   Dated: December 26, 2023

4                                   Respectfully submitted,

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**

By: _Betsy C Manifold_
     BETSY C. MANIFOLD (182450)

ALEX J. TRAMONTANO (276666)
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
Email: manifold@whafh.com
Email: tramontano@whafh.com

Gregory M. Egleston
**GAINEY McKENNA & EGLESTON**
501 Fifth Avenue, 19th Fl.
New York, NY 10017
Phone: (212) 983-1300
Fax: (212) 983-0383
Email: gegleston@gme-aw.com

***Counsel for Plaintiff***